*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 04a0410p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ELOIS DUNIGAN,

        *Plaintiff-Appellant,*

    *v.*

SCOTT NOBLE, Public Safety Officer, and PERCY
JENKINS, Public Safety Officer, Jointly and Severally,

        *Defendants-Appellees.*

No. 03-1304

Appeal from the United States District Court
for the Western District of Michigan at Kalamazoo.
No. 02-00039—Joseph C. Scoville, Magistrate Judge.

Argued: June 10, 2004

Decided and Filed: November 29, 2004

Before: SILER, MOORE, and BALDOCK, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** Douglas A. Merrow, LAW OFFICE OF DOUGLAS A. MERROW, Portage, Michigan, for
Appellant. Mary Massaron Ross, PLUNKETT & COONEY, Detroit, Michigan, for Appellees.
**ON BRIEF:** Douglas A. Merrow, LAW OFFICE OF DOUGLAS A. MERROW, Portage, Michigan, for
Appellant. Mary Massaron Ross, PLUNKETT & COONEY, Detroit, Michigan, for Appellees.

    BALDOCK, J., delivered the opinion of the court, in which SILER, J., joined. MOORE, J. (pp. 9-
11), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

    BALDOCK, Circuit Judge. Around 9:30 a.m. on March 8, 2001, Police Officers Scott Noble and
Percy Jenkins arrived at Plaintiff Elois Dunigan's home in Kalamazoo, Michigan. The officers sought
to arrest Plaintiff's son, Quincy Dunigan, for failure to report to his parole officer. During the ensuing
melee, Officer Jenkins' K-9, Kojak, bit Plaintiff. Plaintiff thereafter filed this § 1983 action alleging, among
other things, excessive force against Officers Noble and Jenkins in violation of the Fourth Amendment.

---

[*] The Honorable Bobby R. Baldock, Circuit Judge of the United States Court of Appeals for the Tenth Circuit, sitting by
designation.

The district court granted the officers summary judgment based on qualified immunity. Plaintiff appeals. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm.[1]

I.

The following relevant facts are undisputed or taken in the light most favorable to Plaintiff: Quincy Dunigan is a convicted felon. He failed to report to his parole officer in violation of the terms of his release. For a year, Leslie Willson, Quincy's parole officer, visited Plaintiff's home on numerous occasions looking for Quincy. A week prior to his arrest, Willson had seen Quincy outside Plaintiff's Kalamazoo residence removing trash. Quincy disappeared before she could speak with him. On the morning of March 8, 2001, Willson received a phone tip suggesting Quincy was at his mother's home. Willson requested police assistance to apprehend Quincy. Officer Noble responded to the call. Willson informed Officer Noble that Quincy was a "runner" and might attempt to evade arrest. Officer Noble called for backup, but did not specifically request a K-9 unit. Officer Jenkins and Kojak arrived soon thereafter. Sergeants Joseph O'Connor and Mark Laster and Officers Scott Block and Mike Skurski also arrived on the scene to secure the home's perimeter. Dispatch informed all responding officers that Quincy might run.

Willson, with Officers Noble and Jenkins at her side, knocked on Plaintiff's back door. Kojak stood with Jenkins wearing a body harness and leash used for tracking. Plaintiff opened the back interior door and remained behind the locked screen door. Willson informed Plaintiff she had "come to get Quincy." Plaintiff responded "just a minute" and shut the interior door. Plaintiff proceeded to the basement's living area where Plaintiff's two sons, Quincy and Tory, and grandson, Shawn, were located. Plaintiff informed Quincy of the officers' presence. When Plaintiff returned and began opening the door, three officers rushed in. Officer Noble entered the home first. Sergeant O'Connor also entered. Officer Jenkins and Kojak proceeded onto the landing directly inside the back door of the home. The landing measures approximately three and one- half square feet. The basement stairs extend down from the landing directly behind the back door. Four stair steps to the right of the back door extend up the landing into the kitchen. *See* Joint App. at 348 (attached hereto).[2]

Officer Noble proceeded to the top step of the kitchen stairs. Sergeant O'Connor proceeded to the basement stairs. Officer Jenkins entered the landing and looked down into the basement. Plaintiff remained on the second step of the kitchen stairs. Officer Jenkins announced that someone was in the basement. He ordered the individual to show his hands, but to no avail. After announcing police presence, Officer Jenkins alerted Kojak to begin barking. At this point, Tory proceeded up the basement stairs through the landing and into the kitchen, passing Kojak and the officers without incident. Immediately thereafter, Officer Noble pushed Plaintiff in the back.[3] The force caused Plaintiff to stumble and move from the second to the first step of the kitchen staircase. When asked what happened when Officer Noble pushed her, Plaintiff

---

[1] Prior to the district court's ruling, Plaintiff voluntarily dismissed her claims against four other officers and the City of Kalamazoo with the exception of a state law claim against the City under the Michigan Dog Bite Statute. *See* Mich. Comp. Laws § 287.351. The district court declined to exercise supplemental jurisdiction over Plaintiff's state law claim. *See* 28 U.S.C. § 1367(c)(3).

[2] Page 348 of the Parties' Joint Appendix sets forth Exhibits 7 and 8 in Support of Defendants' Motion for Summary Judgment. Exhibit 7 is a view from directly inside the back screen door of Plaintiff's home looking down into the basement. The interior back door, visible on the left side of the exhibit, is open. A shirt or other cloth object hangs on the basement stair railing on the right side of the exhibit. Exhibit 8 is a view from the top of the kitchen stairs leading down to the landing. Again, the interior back door is open. The back screen door is partially visible to the left of the interior door.

[3] In their respective depositions, the two officers stated that prior to the contact Officer Noble was between Plaintiff and Kojak. Plaintiff proceeded to jump on Officer Noble's back in an hysterical effort to get at Officer Jenkins and Kojak to protect her son. The officers stated Plaintiff climbed over and around Noble from the kitchen area above and moved towards Officer Jenkins. Plaintiff repeatedly yelled at the officers not to hurt her son. Neither officer places Sergeant O'Connor inside the home at that point.

answered: "That is when the dog attacked me." Kojak bit Plaintiff three times on her leg. Officer Jenkins promptly restrained Kojak by the collar. According to Plaintiff, Officer Noble then "grabbed me by the neck, threw me outside and made me lay face down on the cement sidewalk."[4]

Plaintiff's friend, Kim Marshall, witnessed the entire event. Marshall explained the situation "was pretty chaotic, so there was a lot of yelling and screaming and hysterics going on." Marshall described Plaintiff's emotional state at various points as "very upset," "crying" and "concerned about the dog being in the home and very much concerned about her son." Once the officers entered the home, Plaintiff tried "to explain to them that [Quincy] wanted to turn his self [sic] in, not to–not to hurt him and she was kind of begging them, please, you know, don't hurt her son." Tory was yelling at the officers to leave his mother alone. When asked to describe the push, Marshall responded:

> [Plaintiff] was standing on top of the steps that was right by the kitchen and one of the officers pushed her, so there is three or four steps that lead back to the back door landing area, she lost her footing and at that point she raised herself back up and that is when the dog bit her right in the thigh area.

The district court granted Officers Noble and Jenkins' motion for summary judgment based on qualified immunity. The court first noted Plaintiff characterized the question of excessive force with regard to both officers as arising solely under the Fourth Amendment's proscription against unlawful seizures. As to Officer Jenkins, the court held the evidence failed to establish the requisite seizure through means of force intentionally applied. The district court next held Officer Noble did not use excessive force when pushing Plaintiff aside in a rapidly-evolving, highly volatile situation. The court noted nothing in the record provided a basis for inferring Officer Noble had any intent to injure Plaintiff. On appeal, Plaintiff renews her argument that Officers Jenkins and Noble employed unlawful force in effecting a seizure of her person. Notably, Plaintiff has not challenged the officers' entry into her home or her actual arrest. Defendant Officers again respond with the defense of qualified immunity.

## II.

"Qualified immunity is a government official's 'entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Such immunity is "'an expression of policy designed to aid in the effective functioning of government.'" *Schuer v. Rhodes*, 416 U.S. 232, 242 (1974) (quoting *Barr v. Matteo*, 360 U.S. 564, 572-73 (1959)). Implicit in the qualified immunity doctrine is a recognition that police officers, acting reasonably, may err. *Id.* The concept of immunity thus acknowledges that "it is better to risk some error and possible injury from such error than not to decide or act at all." *Id.*[5]

---

[4] An ambulance arrived shortly thereafter. A paramedic advised Plaintiff: "Mrs. Dunigan, don't talk, don't try to speak because you're on the verge of a heart attack or a stroke. Your blood pressure is 220 over 180." The medical center's "Emergency and Trauma Report" on Plaintiff reads:

> The patient said that she was feeling more comfortable and felt like she wanted to go home. Because this patient's pain was clearly stress induced and it responded immediately with nitroglycerin this appears to be an angina episode for the patient which would not be classified as unstable. . . . Her wound on her leg will not require stitches and because it is not a puncture wound we will not give her antibiotics at this time. . . .

In her deposition, Plaintiff stated her wound subsequently became infected and required surgery. Plaintiff says she has suffered nerve and muscle damage, is in chronic pain, and "might get crippled as I get older." Plaintiff also states she may have contacted Hepatitis-C. Aside from the trauma report, however, the record is devoid of any medical evidence establishing the exact nature and extent of Plaintiff's injuries.

[5] Prior to *Saucier*, a majority of Circuits, including our own, held the question of whether an officer was entitled to qualified immunity from an excessive force claim was identical to the inquiry on the merits of the claim. *See*, *e.g.*, *Bass v. Robinson*, 167 F.3d 1041, 1051 (6th Cir. 1999); *Katz v. United States*, 194 F.3d 962, 968 (9th Cir. 1999) (collecting cases). Thus, under prior

In *Saucier*, the Court carefully delineated a two-fold inquiry to determine an officer's entitlement to qualified immunity in the context of an excessive force claim:

> A court required to rule upon the qualified immunity issue must consider . . . this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts . . . show the officer's conduct violated a constitutional right?  This must be the initial inquiry. . . .
>
> . . .
>
> [I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.  This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . .

*Id.* at 201.[6]  In other words, where a constitutional violation exists, an officer's personal liability turns on the "objective legal reasonableness" of the action *in view of the circumstances the officer confronted assessed in light of "clearly established" legal rules.  Id.* at 202; *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

## III.

As *Saucier* directs, we turn first to the question of whether Officer Jenkins and/or Noble violated Plaintiff's Fourth Amendment right to be free from excessive force.  We review this question de novo, applying the same summary judgment standard as the district court.  We view the evidence in a light most favorable to Plaintiff.  At the same time, we are mindful that "the mere existence of *some* factual dispute" will not frustrate an otherwise proper summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Considering the evidence "through the prism of the substantive evidentiary burden," *id.* at 254, we must determine "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed." *Improvement Co. v. Munson*, 81 U.S. 442, 448 (1872); *accord Anderson*, 477 U.S. at 252; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

## A.

A seizure must occur before an excessive force claim is cognizable under the Fourth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 844-45 & n.7 (1998).[7]  Plaintiff contends Officer Jenkins seized her when he knowingly brought a dangerous animal, Kojak, into the narrow entranceway of

---

law the existence of a genuine factual dispute always precluded summary judgment.  In *Saucier*, the Supreme Court criticized the approach of denying summary judgment "any time a material issue of fact remains on the excessive force claim" as undermining "'the goal of qualified immunity to avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Saucier*, 533 U.S. at 202 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Supreme Court held "the ruling on qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest." *Id.* at 197.

[6]Despite *Saucier*'s direction, some panels of this Court have continued to rely on a three step analysis of qualified immunity claims grounded in our pre-*Saucier* en banc decision in *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc).  *See*, *e.g.*, *Dean v. Byerley*, 354 F.3d 540, 557 (6th Cir. 2004); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).  Other panels acknowledge *Saucier* as binding.  *See*, *e.g.*, *Akers v. McGinnis*, 352 F.3d 1030, 1042 (6th Cir. 2003); *Weaver v. Shadoan*, 340 F.3d 398, 406-07 (6th Cir. 2003); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002); *Bell v. Johnson*, 308 F.3d 594, 601-02 (6th Cir. 2002).  We take the latter approach.

[7]Absent a seizure, an individual injured as a result of police misconduct may pursue a substantive due process claim.  *See Lewis*, 523 U.S. at 844.  Plaintiff does not claim a violation of her substantive due process rights in this case.

her home.[8]  A seizure within the meaning of the Fourth Amendment, however, "requires an intentional acquisition of physical control." *Brower v. Inyo County*, 489 U.S. 593, 596 (1989). "[O]nly when there is a governmental termination of freedom of movement *through means intentionally applied"* is the Fourth Amendment implicated. *Id.* at 597. "[T]he Fourth Amendment addresses 'misuse of power,' . . . not the accidental effects of otherwise lawful government conduct." *Id.* at 596.

Accepting Plaintiff's version of events, nothing in the record suggests Officer Jenkins introduced Kojak into the home intending to seize Plaintiff or that he actually seized Plaintiff "through means intentionally applied." Officer Jenkins, unaware of Quincy Dunigan's precise whereabouts, lawfully brought Kojak into the home. Despite Plaintiff's contrary assertion, the circumstances undoubtedly justified Kojak's presence. Kojak was trained to "track." Quincy Dunigan was a fugitive from law and had been "on the run" for nearly a year. Officer Jenkins legitimately believed Quincy might attempt to flee. Kojak's presence served the legitimate purpose of curtailing that possibility.

Officer Jenkins did not command Kojak to bite Plaintiff and was not responsible for the contact which caused Plaintiff to stumble towards the dog. According to Officer Jenkins, Kojak perceived a threat when Plaintiff stumbled one step down the kitchen stairs into the dog's defensive perimeter. Kojak responded, as trained, by defending its handler. Officer Jenkins quickly restrained and refocused Kojak once the dog began biting Plaintiff. Additionally, Plaintiff stated her son, Tory, came up from the basement into the kitchen immediately preceding the attack without incident. This fact gives rise to the reasonable inference that Officer Jenkins was exercising control over Kojak. As a result, a reasonable jury could only conclude Kojak's actions were a spontaneous response to Plaintiff's "threatening" movement into the dog's defensive perimeter. The district court properly held Officer Jenkins did not seize Plaintiff "through means intentionally applied," and thus, Plaintiff had no cognizable Fourth Amendment claim against Officer Jenkins.

B.

Although for different reasons, we also conclude Officer Noble did not violate Plaintiff's Fourth Amendment rights. Unlike Officer Jenkins, Officer Noble seized Plaintiff when he arrested her. Viewing the evidence in a light most favorable to Plaintiff, however, we conclude Officer Noble did not act unreasonably in making that arrest. The reasonableness inquiry in a Fourth Amendment excessive force case is objective. In *Graham v. Connor*, 490 U.S. 386, 397 (1989), the Supreme Court explained the relevant

> question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, *without regard to the underlying intent or motivation*. . . . An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

(emphasis added).

Whether an officer's use of force was reasonable turns on the facts of each case. Relevant to the inquiry are (1) the severity of the crime at issue, (2) the immediate threat the suspect poses to the safety of

---

[8]Plaintiff has continually maintained Kojak is an instrument of deadly force. Notably, Plaintiff does not claim or present evidence that Kojak was improperly trained. No federal appeals court has held a properly trained police dog is an instrument of deadly force. *See Kuha v. City of Minnetonka*, 365 F.3d 590, 597-98 (8th Cir. 2003) (citing cases). Instead, we explained in *Robinette v. Barnes*, 854 F.2d 909, 913 (6th Cir. 1988):

> We do not dispute the fact that trained police dogs can appear to be dangerous, threatening animals. The dogs' ability to aid law enforcement would be minimal if they did not possess this trait. However, the mere recognition that a law enforcement tool is dangerous does not suffice as proof that the tool is an instrument of deadly force.

the officer or others, (3) the suspect's resistance, if any, and (4) the possibility of flight. *Id.* at 396. The objective reasonableness inquiry is well-established:

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . *Not every push or shove*, even if it may later seem unnecessary in the peace of a judge's chamber, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (internal quotation and citation omitted) (emphasis added); *accord Saucier* 533 U.S. at 204-05. The relevant question, then, is whether a reasonable officer on the scene could have believed Officer Noble's push of Plaintiff from one step to the next in the close confines of the stairwell and landing while in the presence of a police dog was unlawful. Officer Noble's subjective intentions are irrelevant.

In her brief, Plaintiff admits she was "understandably upset" over the situation, but claims she posed no threat whatsoever to anyone. Plaintiff is mistaken. Kim Marshall, Plaintiff's own witness, stated the situation "was pretty chaotic, so there was a lot of yelling and screaming and hysterics going on." Marshall stated Plaintiff "was begging" the officers not to hurt her son. As the officers entered the home, Plaintiff was necessarily standing in front of them given the small confines of the landing. *See* Joint App. at 348. Plaintiff knew for certain Quincy was in the basement when Officers Jenkins and Noble entered the home. The officers did not possess such knowledge as Plaintiff had closed the inside back door blocking the officer's view before she went to the basement to inform Quincy of the officers' presence. Instead of moving out of the officers' path, Plaintiff made the decision to remain close by on the kitchen steps.

Perhaps Officer Noble moved up the stairs past Plaintiff to cut off an escape route or get a view of his back side. Regardless, we will not second guess Officer Noble's actions.[9] Officer Noble was confronted with a rapidly-evolving, highly-volatile situation which precluded the luxury of calm and reflective pre-response deliberation. *See Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). Officer Noble had no opportunity to ponder or debate his reaction to the potentially explosive situation. Simply stated, Plaintiff's insistence on remaining in the middle of a chaotic, tense, and rapidly evolving situation posed a risk to herself, to Quincy, the officers seeking to arrest Quincy, and the other individuals present. Moreover, Plaintiff's presence in the midst of this situation interfered with Officer Noble's efforts to perform his duties.

Plaintiff points out she is not a felon and was not fleeing or attempting to evade arrest. She misses the point. At the time the push occurred, Officer Noble's focus was on Quincy Dunigan. Officer Noble knew (1) Quincy had been a fugitive from the law for nearly a year and might attempt to flee, (2) at least one unidentified individual was in the basement directly below, and (3) that individual posed a potential threat by refusing to show his hands as ordered. *See Graham*, 490 U.S. at 396. Moreover, Officer Noble did *not* have cover on his back side and did *not* know who else was in the home. He could not see into the basement from his location on the kitchen stairs. *See* Joint App. at 348. Amidst all these uncertainties, Officer Noble applied force to Plaintiff's back or shoulder in closely confined quarters causing her to momentarily lose her balance and stumble down one step of stairs towards Kojak.

That Kojak responded as trained does not change our analysis. Kojak's presence on the landing was undoubtedly lawful. The evidence further reveals that Officer Noble had no control over Kojak. Officer Noble stated without contradiction that he did not call for a police dog, is not trained in handling police dogs, and does not know their commands. He further testified the policy of the City of Kalamazoo, by

---

[9]Given the situation, no reasonable jury could conclude Plaintiff stood between Officer Jenkins and Noble for "five to ten minutes" as she claims before Officer Noble made contact with her.

which he abides, is to follow the directions and orders of the dog handler when a canine is present. Plaintiff's case is further undermined by her own statement that *immediately* preceding the push Tory ran past Kojak in the narrow confines of the landing and stairwell without incident. Under Plaintiff's version of events, Officer Noble could not have missed observing Tory. Thus, Officer Noble had no reason to believe his minimal use of force which caused Plaintiff to momentarily stumble would cause Kojak to react. Nor would any reasonable officer so believe.[10]

A contrary conclusion would invite any third party who is unhappy about an arrest to resist that arrest, however mildly, hoping an officer would simply desist rather than chance violating that party's constitutional rights. This is simply an unacceptable alternative. For us to "fine-tune" the situation arising in Plaintiff's home on the morning of March 8, 2001, from the warm comfort of our chambers would undercut the *necessary* element of judgment inherent in Officer Noble's attempt to control a volatile chain of events. *See Brown v. Gilmore*, 278 F.3d 362, 369-70 (4th Cir. 2002). "[J]udged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, Officer Noble's actions did not violate Plaintiff's Fourth Amendment rights.

IV.

For the foregoing reasons, the district court properly held Officer Noble and Officer Jenkins were entitled to qualified immunity. Because we decide this case under the first prong of *Saucier*'s two part qualified immunity inquiry, we do not reach the second prong of that inquiry. The judgment of the district court is–

AFFIRMED.

---

[10]Because the Fourth Amendment does not duplicate state tort law, we make no judgment as to whether under the facts of this case Officer Jenkins or Noble exercised reasonable care in the "tort sense." Michigan state law may or may not afford Plaintiff a remedy.



---

**CONCURRING IN PART, DISSENTING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. Although I concur in the majority's opinion affirming summary judgment in favor of Officer Percy Jenkins ("Officer Jenkins"), I respectfully dissent from the majority's holding that qualified immunity shields Officer Scott Noble ("Officer Noble") from liability because I believe that Officer Noble's use of force against Elois Dunigan ("Dunigan") was an objectively unreasonable violation of Dunigan's clearly established Fourth Amendment rights.

Determining whether the actions of a police officer rise to the level of unconstitutionally excessive force is often a difficult task, for police officers frequently must make on-the-spot decisions in the face of chaotic, rapidly-evolving, and potentially dangerous situations. Indeed, we repeatedly draw upon, as if by rote, the Supreme Court's guiding maxims that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," and that we should not judge police officers' conduct "with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). However, acknowledging the fact that police officers operate in a fast-paced, uncertain environment should not lead to our reflexive rubber-stamping of "every push or shove" by a police officer. Rather, in each case we must determine whether, given similar circumstances, a reasonable and prudent police officer would have acted in like fashion, taking into consideration such factors as the severity of the crime involved and the immediate threat to safety posed by the seized person. After reviewing the events that transpired at the Dunigan residence on the morning of March 8, 2001 in the light most favorable to Dunigan, I believe that Officer Noble acted unreasonably and with excessive force in pushing Dunigan, a fifty-nine-year-old woman, down a narrow stairway towards another police officer and his police dog.

First, Officer Noble and the other members of the Kalamazoo Police Department reported to the Dunigan residence not in response to a violent crime, but rather simply to take Dunigan's son, Quincy Dunigan ("Quincy"), into custody for failing to report to his parole officer, Leslie Willson ("Willson"). Although Willson enlisted the aid of several police officers to help effectuate Quincy's arrest because Quincy had a history of attempting to flee police custody, the record does not seem to indicate that Quincy had a history of violent behavior. Indeed, Dunigan indicated that Willson and Officer Noble had come to her home several times looking for Quincy and that they had walked through her home without incident just a few weeks earlier. Joint Appendix ("J.A.") at 158 (Elois Dunigan Dep.).

Second, contrary to the majority's suggestion, Dunigan did not pose a serious threat to the safety of others present by being emotionally agitated, yelling, and screaming. According to Dunigan, she was not upset and did not yell at the officers. J.A. at 158-59 (Elois Dunigan Dep.). However, even if Dunigan was emotionally upset by the entry of police officers and a police dog into her home, a reasonable and prudent police officer would not attempt to diffuse such a situation by pushing the upset bystander from behind and down a stairway in the direction of other officers and a police dog.

The majority also contends that Dunigan posed a threat to the police officers by remaining on the kitchen steps and not moving out of the officers' path. However, the record does not seem to indicate that the officers asked Dunigan to step outdoors or to move to another part of the house while they executed the search. Furthermore, because Dunigan claims to have been standing between Officers Noble and Jenkins on the stairway, Dunigan could go nowhere without moving in the direction of at least one of the officers, which itself could have been interpreted by the officers as a threatening or hostile act. Ultimately, if there was a need to remove Dunigan from the main area of activity, pushing her downstairs further into the fray in the direction of Officer Jenkins, police dog Kojak, and the primary ingress point for other officers was not a reasonable means of accomplishing such an objective. J.A. at 225 (Scott Noble Dep.) ("Q. Other than

it would constitute an excessive use of force, what are all of the other reasons for which you would not want to do that sort of thing? A. I would not want to push her down in the way of what is going on because she's going to interfere more with what is going on down there. I want to keep her out of the area. Q. So pushing her down under that hypothetical scenario, Number 1, would pose a risk of— A. Risk to Percy. Q. It would pose a risk of serious injury to her from the dog, correct? A. Correct. Q. It would pose a risk to Percy Jenkins? A. Correct. Q. What else? A. Anybody else that is down there.").

The majority also justifies Officer Noble's actions by explaining that he faced a situation fraught with uncertainties in that the officers were attempting to arrest someone who had a history of evading capture, there was an unknown person in the basement who refused to show his hands, and there might have been other persons in the home who could attack the officers. To determine whether a police officer has acted reasonably, we must evaluate the amount and type of force used in light of the particular uncertainties facing the officer. In this case, Officer Noble acted unreasonably notwithstanding the general air of uncertainty at the Dunigan residence because the force he used (pushing Dunigan down the stairs toward Officer Jenkins and police dog Kojak) bears no reasonable relation to the specific uncertainties the majority says Officer Noble faced (Quincy's history of fleeing, the presence of an unidentified person in the basement, and the possibility of other persons being in the house).

Finally, the majority contends that Officer Noble had no reason to expect that Dunigan's stumbling down the stairway would cause Kojak to bite her because Officer Noble had previously witnessed one of Dunigan's sons run past Kojak without being attacked. However, Officer Jenkins testified that police dogs are trained to protect their police handlers and agreed that it "wouldn't be a reasonable use of force to push somebody towards a police dog handler and a police dog . . . [b]ecause the dog could bite them." J.A. at 256 (Percy Jenkins Dep.). Furthermore, even if it were reasonable for Office Noble to assume that Kojak would not bite Dunigan if she were pushed in his direction, the fact that a fifty-nine-year-old woman could be injured if pushed down a stairway should not have come as a surprise to Officer Noble. That Dunigan's injuries took the form of a dog bite rather than a broken hip or sprained ankle does not make Officer Noble's actions any more reasonable.

Because pushing a fifty-nine-year-old female bystander from behind and without provocation down a stairway in the direction of other police officers and a police dog amounts to unconstitutionally excessive force, I believe that Officer Noble violated Dunigan's Fourth Amendment rights. Moreover, I do not believe that Officer Noble should be immune from liability, as his conduct was objectively unreasonable in light of clearly established law at the time of the incident. The doctrine of qualified immunity is driven by the notion that, although a government official may have violated a citizen's rights, "'[i]f the law at that time was not clearly established, an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.'" *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (second alteration in *Champion*). Here, however, Office Noble admitted during his deposition that, if Dunigan's allegations were true, his actions would constitute excessive force:

> Q. . . . Let's assume there is an eyewitness who says that you pushed Miss Dunigan, that she was not posing any sort of physical threat, nor was she antagonizing the dog, and that you pushed her from behind on the shoulder into the direction of the dog which was barking and which was located in close proximity, are you telling me that that is something that you didn't do?
> A. That is correct.
> Q. Are you telling me is something that you wouldn't do?
> A. I would not do that.
> Q. And one of the reasons you would not do that is because in your opinion that would be an excessive use of force under those circumstances, would it not, Officer?
> A. Correct.

Q.      Okay.  And that's your opinion based on your 14 years experience on the
        Kalamazoo force, as well as your education and training —
A.      That's correct.
Q.      — in-service academy, et cetera, correct?
A.      Correct.

J.A. at 224-25 (Scott Noble Dep.).  Moreover, at the time of the events in question, the right of bystanders not to be attacked, particularly from behind and without provocation, was clearly established in this court and others.  *See Dugan v. Brooks*, 818 F.2d 513, 516-17 (6th Cir. 1987) (vacating district court's order dismissing suit for failure to state a claim, concluding that complaint which "not only alleges that [the officer] arrested [the plaintiff] without probable cause but also alleges that, in doing so, with malice and without warning or justification, struck [the plaintiff] on the head from behind, knocking him to the floor and seriously injuring him . . . clearly alleges a deprivation of the rights secured by the fourth amendment as made applicable to the states by the fourteenth amendment"); *Teames v. Henry*, No. Civ. 3:03-CV-1236-H, 2004 WL 357961, *3-4 (N.D. Tex. 2004) (denying police officer's motion for summary judgment on the basis of qualified immunity in suit alleging that the officer violated the Fourth Amendment rights of a seventy-nine-year-old woman by pushing her off a porch, and citing cases from 1998 and earlier in support of its finding that "a bystander's right to be free from an officer's use of excessive force . . . was clearly established in . . . 2002 when [the officer] allegedly used excessive force"); *see also Kain v. Nesbitt*, 156 F.3d 669, 670, 673 (6th Cir. 1998) (reversing grant of summary judgment for police officer on the basis of qualified immunity because jury should resolve fact question of whether officer was reasonable in grabbing mother and pushing her against the wall during search for her son).

In sum, because I believe that Office Noble's conduct violated Dunigan's Fourth Amendment right not to be seized with excessive force and was objectively unreasonable in light of clearly established law, I respectfully dissent from the majority affirmance of summary judgment in favor of Officer Noble.