**Heral HOWARD, as the Administrator of the Estate of Tammy HOWARD, Plaintiff,**

v.

**Paul BAYES, individually and in his official capacity; Pat Montgomery, individually and in his official capacity; and Magoffin County Fiscal Court, Defendants.**

No. CIV.A. 7:02–204–DCR.

United States District Court, E.D. Kentucky, Pikeville Division.

Jan. 5, 2005.

Ned B. Pillersdorf, Joseph R. Lane, Pillersdorf, Derossett & Lane Prestonsburg, KY, for plaintiff.

Jonathan C. Shaw, Michael J. Schmitt, Porter, Schmitt, Jones & Banks, Paintsville, KY, for defendants.

## AMENDED MEMORANDUM OPINION AND ORDER

REEVES, District Judge.

This matter is pending for consideration of the Defendants' motion for summary judgment. [Record No. 29] For the reasons discussed below, the Court will grant the Defendants' motion.[1]

### I. Background

On April 29, 2002, in response to a 911 call, two ambulances from Magoffin County, as well as Magoffin Deputy Sheriff Paul Bayes, were called to Tammy Howard's residence for a possible drug overdose. It is unclear who called for help because Howard was apparently unaware that anyone had called 911. (Bayes Depo. at 18; Lykins Stmt. at 3 (attached to Maynard Depo.)) Also at the residence was Gerald Williams, who was apparently Howard's boyfriend.

Howard was very drunk and refused medical attention. Towards the end of Deputy Bayes' investigation, Magoffin Deputy Sheriff Carl Adams arrived on the scene. Both Bayes and Adams contend that Howard had no visible injuries. (Bayes Depo. at 18; Adams Testimony at 1311.) However, paramedics Charles Tackett and Paul Puckett noticed a small "mark" under one of Howard's eyes, but they claim that the mark was not fresh and that there was no indication of any recent altercation. (Tackett Aff. at 1; Puckett Aff. at 1.) Paramedic Carlos Lykins also noticed a "fading" bruise that appeared to be several days old. (Lykins Stmt. at 3.)

Tackett and Puckett further noted: (1) that Howard did not allege abuse; (2) that it did not appear that Howard and Williams had been fighting; and (3) that Howard appeared happy. (Tackett Aff. at 1; Puckett Aff. at 1.) Bayes and Adams also testified that Howard did not allege any abuse. (Bayes Depo. at 18; Adams Testimony at 1312.) Lykins, however, was suspicious that Williams and Howard had "got into it" at some point in the past and claims that he suggested to Bayes that he separate the two. (Lykins Stmt. at 6–7.) In their report, Tackett and Puckett simply noted that they had responded to a possible overdose call, that Howard had been drinking, that she was oriented to person, place, and time, and that she refused medical treatment. (Run Report.)

Paramedics were again dispatched to Howard's residence on April 30th, the following day. She had been beaten and was unconscious. Howard later died from her injuries. Her boyfriend, Gerald Williams, was convicted for her murder on March 3, 2004 in Magoffin Circuit Court. He was sentenced to thirty years in prison.

On May 24, 2002, the Plaintiff filed suit against the Defendants, alleging that they violated Tammy Howard's Fourth and Fourteenth Amendment rights, acting under color of state law, in violation of 42 U.S.C. § .1983.[2] Specifically, he claims that the Defendants violated several Kentucky statutes pertaining to police officer conduct in relation to domestic violence incidents.

### II. Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to in-

---

1. This amended memorandum opinion is entered pursuant to Rule 60(a) of the Federal Rules of Civil Procedure. While the Defendant has filed a notice of appeal, that appeal has yet to be docketed by the Sixth Circuit, so the Court has the authority to *sua sponte* amend its orders. This amended opinion al-ters only Sections III(B)-(C) and does not impact the resolution of this case, or the Court's prior judgment.

2. Plaintiff also alleges several related state law claims.

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.,* 285 F.3d 415 (6th Cir.2002). Once the movant has satisfied this burden, the non-movant must go beyond the assertions made in the pleadings and come forward with specific evidence to demonstrate that there is a genuine issue of material fact. *Id.* The nonmoving party cannot rely upon the assertions in its pleadings; rather, that party must come forward with probative evidence, such as sworn affidavits, to support its claims. *Celotex,* at 324, 106 S.Ct. 2548.

However, the trial court does not have a duty to search the entire record to establish that it is bereft of any genuine issue of material fact. *In re Morris,* 260 F.3d 654 (6th Cir.2001). The nonmoving party has an affirmative obligation to direct the court's attention to those specific portions of the record upon which it seeks to rely to create genuine issues of material fact. *Id.* In determining whether there are any genuine issues of material fact, the Court must review all the facts and the inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. Legal Analysis

Plaintiff makes two separate claims. First, he asserts that Bayes violated several mandatory regulations pertaining to domestic violence cases. Second, he claims that Montgomery failed to insure that Bayes was properly trained.

### A. *Domestic Violence Regulations*

Plaintiff claims that Bayes violated the provisions of K.R.S. §§ 403.715, 403.785, and 431.005. Bayes, however, contends that he is protected by the doctrine of official immunity for his actions. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Yanero v. Davis,* 65 S.W.3d 510, 521–22 (Ky.2001). The doctrine "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen,* 543 U.S. ——, 125 S.Ct. 596, 599, 160 L.Ed.2d 583, 2004 WL 2847251, at *3 (2004). As the Sixth Circuit recently put it, "State officials are protected by qualified immunity that shields them from civil damages as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Mills v. City of Barbourville,* 389 F.3d 568, 574

(6th Cir.2004). Whether qualified immunity applies to an official's actions is a question of law. *Id.* at 575.

Plaintiffs contend that Bayes 'conduct was not discretionary and was, in fact, ministerial, in that his conduct was proscribed by several Kentucky statutes.

### 1. Discretionary or Ministerial Duties

a. K.R.S. § 431.005(2)(a)

■ K.R.S. § 431.005(2)(a) provides that:

Any peace officer *may* arrest a person without warrant when the peace officer has probable cause to believe that the person has intentionally or wantonly caused physical injury to a family member or member of an unmarried couple.

K.R.S. § 431.005(2)(a) (emphasis added). This statute clearly leaves the discretion to arrest with the police officer.

Plaintiff cites the deposition testimony of Detective David Maynard, who investigated Howard's death and interviewed some of those who responded to the April 29th 911 call. Detective Maynard testified that police officers are under an obligation to arrest people suspected of domestic violence. (Maynard Depo. at 15–16.) The plain language of K.R.S. § 431.005(2)(a), however, states that an officer *may* arrest suspected domestic violence perpetrators without a warrant. Moreover, the officer must make the discretionary determination that he has probable cause to arrest.[3]

b. K.R.S. § 403.785(2)

■ K.R.S. § 403.785(2) provides that:

When a law enforcement officer has reason to suspect that a family member, member of an unmarried couple, or

household member has been the victim of domestic violence and abuse, the officer shall use all reasonable means to prevent further abuse, including but not limited to:

(a) Remaining at the location of the domestic violence and abuse so long as the officer reasonably suspects there is danger to the physical safety of individuals present without the presence of a law enforcement officer;

(b) Assisting the victim of domestic violence and abuse in obtaining medical treatment, including transporting the victim to the nearest medical facility capable of providing the necessary treatment; and

(c) Advising the victim immediately of the rights available to them, including the provisions of KRS 403.715 to 403.785.

K.R.S. § 403.785(2). Although this statute provides that the officer "*shall* use all reasonable means," to prevent abuse, the statute only applies if the officer has reason to suspect abuse and only requires that the officer use "reasonable means" to prevent further abuse.

As the *Yanero* Court held, discretionary functions are those that "involve the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Yanero*, 65 S.W.3d at 522 (citation omitted). Further, as the Sixth Circuit and the Kentucky Supreme Court have recognized,

[t]he essence of a discretionary power is that the person or persons exercising it may choose which of several courses will be followed. The power to exercise an honest discretion necessarily includes the power to make an honest mistake of judgment.... Discretionary ... duties

---

**3.** Plaintiff's logic would leave the officer with a Hobson's choice: arrest Williams without probable cause and likely face a 1983 suit for false arrest, or leave Williams and face a 1983 suit for failing to protect Howard.

are such as necessarily require the exercise of reason in the adaptation of means to an end, and *discretion in determining ... whether the act shall be done or the course pursued.*

*Minger v. Green,* 239 F.3d 793, 798 n. 2 (6th Cir.2001) (quoting *Franklin County v. Malone,* 957 S.W.2d 195, 201 (Ky.1997))[4] (emphasis added).

Conversely, the Second Restatement describes ministerial functions in the following manner:

If an act of the official involves less in the way of personal decision or judgment or the matter for which judgment is required has little bearing of importance upon the validity of the act, there is no immunity or privilege. These acts are commonly called "ministerial," or sometimes "operational." The distinction is always one of degree. Ministerial acts are those done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how or under what circumstances their acts are to be done. Examples of acts held to be ministerial under ordinary circumstances are the preparation of ballots, the registration of voters, the recording of documents and filing of papers, the care of prisoners, the driving of vehicles, the repair of highways, the collection of taxes, the taking of acknowledgments and the dipping of sheep. Yet under particular fact circumstances each of them may be held to involve the exercise of discretionary decision.

Restatement (Second) of Torts § 895D cmt. h (1979).

K.R.S. § 403.785(2) applies only if the officer concludes, based upon his judgment, that abuse is occurring. Further,

the remedies available are entirely at the discretion of the officer. Determining whether domestic violence has occurred and in what manner to remedy the situation is clearly not akin to traditional ministerial duties and instead falls squarely within the realm of a discretionary function.

■ In making judgment calls and decisions, "[t]he ability of police officers to protect the public can be severely hampered ... if their every decision is subject to second-guessing in a lawsuit." *Torchinsky v. Siwinski,* 942 F.2d 257, 261 (4th Cir.1991). Indeed, "[i]mplicit in the qualified immunity doctrine is a recognition that police officers, acting reasonably, may err." *Dunigan v. Noble,* 390 F.3d 486, 490–91 (6th Cir.2004). Because "the power to exercise an honest discretion necessarily includes the power to make an honest mistake," any action pursuant to K.R.S. § 403.785(2), which relies upon the judgment of the police officer to determine whether abuse has occurred and how best to respond, is barred by qualified official immunity. And, while the discretionary nature of Bayes' decisions cloaks his actions in qualified official immunity regardless of whether his decision was negligent or erroneous, it is worth noting that: (1) three other persons present at the scene did not suspect *any* spousal abuse; (2) Howard did not allege abuse and was unsure why the authorities had come to her house; (3) neither officer observed any injuries; and (4) the officers were responding to a drug overdose call.

c. K.R.S. §§ 403.715(3), 431.005(4)

■ K.R.S. § 403.715 provides, in relevant part, that:

KRS 403.715 to 403.785 shall be interpreted by the courts of the Common-

<hr>

4. *Malone* was overruled on other grounds by *Yanero.*

wealth of Kentucky to effectuate the following express legislative purposes:

(3) To provide peace officers with the authority to immediately apprehend and charge for violation of a protective order any person whom the officer has probable cause to believe has violated an order of protection issued under KRS 403.740 or 403.750 and to provide courts with the authority to conduct contempt of court proceedings for these violations
. . . .

K.R.S. § 403.715. K.R.S. § 431.005(4) provides that:

If a law enforcement officer has probable cause to believe that a person has violated a condition of release imposed in accordance with KRS 431.064 and verifies that the alleged violator has notice of the conditions, the officer shall, without a warrant, arrest the alleged violator whether the violation was committed in or outside the presence of the officer.

K.R.S. § 431.005(4). Plaintiff claims that Gerald Williams was subject to a DVO at the time of Howard's murder. It does not appear that there is any evidence in the record, however, to support the existence of the DVO. Plaintiff merely cites the deposition testimony of Sheriff Pat Montgomery. In addition, Plaintiff does not even attach Montgomery's deposition, and therefore his testimony (with the exception of a small portion attached to the Defendants' motion for summary judgment) is not a part of the record. Regardless, even if a DVO existed, it was "entered with regard to his former wife, Debra Williams" (Plf.'s Response at 6) and it is undisputed that Bayes was unaware of the DVO at the time he responded to the Howard residence (Bayes Depo. at 14).

Further, because Plaintiff has not included the DVO in the record, it is unclear whether it prohibited Williams from performing further acts of domestic abuse without regard to the victim. *Compare* KRS § 403.740 (the order *shall* "restrain the adverse party from committing further acts of domestic violence and abuse"), *with* KRS § 403.750 (the order *may* "restrain the adverse party from committing further acts of domestic violence and abuse"). And finally, as discussed *supra*, deciding whether to investigate the existence of a DVO was a discretionary function because it required the use of reasoning and judgment on the part of Bayes, especially given the lack of evidence to have suggested that a DVO existed (if, in fact, it did exist, as alleged by the Plaintiff).

2. Violation of Clearly Established Constitutional Right

Determining whether a government official was performing a discretionary act, however, does not end the qualified immunity analysis. After concluding that an official's decisions are discretionary in nature, courts engage in a three-step inquiry for claims of qualified immunity:

First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir.2003) (quotation omitted).

■ Here, the Plaintiff has not demonstrated that Bayes violated any clearly established constitutional rights of Howard. The Plaintiff's complaint claims that Bayes

violated the Fourth and Fourteenth Amendments of the United States Constitution, but he has not pled any facts to support these arguments and his summary judgment brief sheds no light on the issue. (Compl. at ¶ 10; Plf.'s Resp.) While Howard has a substantive due process right to her life, Bayes did not violate that right; rather, it was Gerald Williams that killed Howard and is responsible for her death. Plaintiff does not offer any theory under which Bayes should be responsible for Howard's death, other than asserting that he failed to protect her.

In *DeShaney v. Winnebago County Dept. of Soc. Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court considered a case in which the plaintiff brought a Section 1983 suit, claiming that the state was negligent in failing to protect a minor child, in violation of the child's substantive due process rights. As the high court noted, the facts of the "case are undeniably tragic." *Id.* at 191, 109 S.Ct. 998. In 1982 authorities learned that three year-old Joshua DeShaney might have been a victim of abuse from his father. The county social services office interviewed the father, but did not pursue the matter any further. A year later, Joshua was admitted to a hospital with multiple bruises and abrasions. Child abuse was suspected and a family court judged issued an emergency order temporarily placing Joshua in the hospital's custody. The hospital, along with police and social services, investigated and determined there was not sufficient evidence to keep Joshua from his father. Social services recommended, however, that Joshua enroll in preschool, that his father attend counseling services, and that his father's girlfriend move out of their house. The Supreme Court summarized the tragic conclusion to the story:

A month later, emergency room personnel called the DSS caseworker handling Joshua's case to report that he had once again been treated for suspicious injuries. The caseworker concluded that there was no basis for action. For the next six months, the caseworker made monthly visits to the DeShaney home, during which she observed a number of suspicious injuries on Joshua's head; she also noticed that he had not been enrolled in school, and that the girlfriend had not moved out. The caseworker dutifully recorded these incidents in her files, along with her continuing suspicions that someone in the DeShaney household was physically abusing Joshua, but she did nothing more. In November 1983, the emergency room notified DSS that Joshua had been treated once again for injuries that they believed to be caused by child abuse. On the caseworker's next two visits to the DeShaney home, she was told that Joshua was too ill to see her. Still DSS took no action.

In March 1984, Randy DeShaney beat 4–year–old Joshua so severely that he fell into a life-threatening coma. Emergency brain surgery revealed a series of hemorrhages caused by traumatic injuries to the head inflicted over a long period of time. Joshua did not die, but he suffered brain damage so severe that he is expected to spend the rest of his life confined to an institution for the profoundly retarded. Randy DeShaney was subsequently tried and convicted of child abuse.

*Id.* at 192–93, 109 S.Ct. 998.

Joshua and his mother brought a 1983 action against the county, DSS, and various individual employees, claiming that they had violated Joshua's substantive due process rights by failing to intervene when they knew his father posed a grave danger

to him. *Id.* at 193, 109 S.Ct. 998. The Court began its analysis by noting that nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text.... It's purpose was to protect the people from the State, not to ensure that the State protected them from each other.

*Id.* at 195–96, 109 S.Ct. 998. The Court went on to conclude:

> [i]f the Due Process Clause does not require the State to provide its citizens with particular protective services, it follow that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that *a State's failure to protect on individual against private violence simply does not constitute a violation of the Due Process Clause.*

*Id.* at 196–97, 109 S.Ct. 998 (emphasis added).

The Court found only one clear circumstance in which the state might have substantive due process liability for failing to protect a citizen from other citizens, *i.e.,* when the victim is in State custody. *Id.* at 198–99, 109 S.Ct. 998. Various federal courts of appeal have crafted a second exception from the language in *DeShaney:* the "state-created danger" exception. The

*DeShaney* Court noted that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201, 109 S.Ct. 998. Appellate courts have stretched this language to mean that when the State is aware of a danger and takes affirmative steps to increase that danger, the state may be liable for private acts of violence. *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1065–67 (6th Cir.1998). Liability then only attaches if the state's acts "shock the conscience." In this case, while there is minimal evidence suggesting that Bayes may have been aware of some danger, it is undisputed that Bayes did not take affirmative steps to increase that danger. In fact, Plaintiff's claims all relate to Bayes *failure* to act. "[T]he 'state-created-danger' theory ... requires an affirmative act on the part of the defendants. Here, the plaintiffs challenge the defendants' *failure to act,* which cannot logically form the basis for liability under the 'state-created-danger' theory." *King v. City of Eastpointe,* 86 Fed.Appx. 790, 811 (6th Cir. 2003) (emphasis in original). Therefore, Plaintiff cannot establish any due process violation because "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney,* 489 U.S. at 197, 109 S.Ct. 998.

■ Although it is not entirely clear from his brief, it seems that the Plaintiff may also be arguing that Bayes' actions violated a clearly established constitutional or statutory right of Howard by violating K.R.S. §§ 403.715, 403.785, and 431.005. The "clearly established right" that the plaintiff must demonstrate the defendant violated can only be the *federal* right the defendant is alleged to have violated pursuant to Section 1983, and not a *state*

right. *Elder v. Holloway*, 510 U.S. 510, 515, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). Therefore, Bayes is entitled to qualified immunity for his actions as there is no evidence that he violated a clearly established federal right.

### B. *Officer Training*

■ The Plaintiff also claims that the Magoffin County Fiscal Court ("Magoffin County") was negligent in training Bayes, noting that he did not complete the 40 hour domestic violence training as part of the 16–week Police Academy. As discussed previously, however, no state actor violated Plaintiff's constitutional rights. Section 1983 plaintiffs must "show that the City and County as entities caused the constitutional violation." *Cash v. Hamilton County Dept. of Adult Probation*, 388 F.3d 539, 543 (6th Cir.2004). In addition, Section 1983 claims cannot be based upon theories of *respondeat superior* liability. *Id.* at 542–43. Because Bayes did not violate any of Plaintiff's constitutional rights, it necessarily follows that Sheriff Montgomery and Magoffin County could not be liable for a Section 1983 claim.

While ultimately irrelevant to this Court's 1983 analysis, it should also be noted that Sheriff Montgomery and Magoffin County followed the relevant state guidelines for officer training. By statute, officers have one year in which to complete their training. K.R.S. § 15.404(1). This time, however, may be extended by up to six months in the event of extenuating circumstances. K.R.S. § 15.404(3). Sheriff Montgomery granted Bayes such an extension because of medical problems with Bayes' wife. (Montgomery Depo. at 6.) When he did not complete the training within the requisite time-frame, he was automatically terminated. (*Id.* at 7.) Plaintiff has presented absolutely no evidence suggesting that Montgomery was negligent in his training of Bayes.

### C. *Wrongful Death / Negligence Claim*

■■ Plaintiff also raises related state law claim of wrongful death. Her state law claims fail because (1) Howard was not in state custody or otherwise restrained by state officials at the time her injuries occurred and (2) the violent act was not perpetrated by a state official. *City of Florence v. Chipman*, 38 S.W.3d 387, 391–92 (Ky.2001). In addition, state sovereign immunity protects Sheriff Montgomery, in his official capacity, and Magoffin County. *Criswell v. Wayne County, Ky.*, 165 F.3d 26 (Table), 1998 WL 598739 (6th Cir.1998).

### IV. Conclusion

The Defendants have satisfied their burden of demonstrating that there are no genuine issues of material fact. The Plaintiff's claims are barred by qualified official immunity and sovereign immunity. Thus, considering the evidence in the light most favorable to the Plaintiff, it is clear that there is no genuine issue as to any material fact and the Defendants are therefore entitled to summary judgment.

Accordingly, for the reasons discussed herein, it is hereby **ORDERED** as follows:

(1) The Defendants' motion for summary judgment [Record No. 29] is **GRANTED**;

(2) The previous memorandum opinion [Record No. 40] is **VACATED**; and

(3) The Clerk of the Court is ordered to submit this amended memorandum opinion to the Sixth Circuit Court of Appeals.