**Judi PATRIZI, Plaintiff**

v.

**Scott W. HUFF, et al., Defendants.**

**Case No. 1:09 CV 2830.**

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 26, 2011.

Jennifer L. Branch, Alphonse A. Gerhardstein, Gerhardstein & Branch, Cincinnati, OH, for Plaintiff.

Gary S. Singletary, Joseph F. Scott, City of Cleveland, Cleveland, OH, for Defendants.

*MEMORANDUM OF OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

LESLEY WELLS, District Judge.

This case arose when defendants Scott Huff and Thomas Connole of the City of Cleveland Police Department arrested plaintiff Judi Patrizi on charges of obstructing official business during an early morning police investigation. As a result of this arrest, Ms. Patrizi filed a three-count complaint against the above-named defendants. The first count of the complaint alleges violations pursuant to 42 U.S.C. § 1983 and the Fourth Amendment. The second and third counts of the complaint alleged false arrest and malicious prosecution, respectively. (Doc. 1). Ms. Patrizi has since dismissed these latter two state law claims. (Doc. 12).

On 2 December 2010, the defendants filed a motion for summary judgment on the remaining Section 1983 claim, contending that Ms. Patrizi's arrest was objectively reasonable in light of the circumstances, and, in the alternative, that their conduct should be subject to qualified immunity as action which is not "clearly established" as a violation of the Fourth Amendment. (Doc. 30). Ms. Patrizi opposed the motion. (Doc. 35).

This matter was referred to Magistrate Judge Kenneth S. McHargh. On 31 March 2011, Judge McHargh issued a Report and Recommendation ("R & R") denying summary judgment. (Doc. 42). On 13 April 2011, the defendants submitted objections to this R & R. (Doc. 43). On 27 April 2011, Ms. Patrizi submitted her response to these objections. (Doc. 44). The matter is now ripe for review.

For the reasons discussed below, the Court will deny the defendants' motion for summary judgment.

## I. BACKGROUND

On the evening of 9 December 2007, Ms. Patrizi arrived at a nightclub called "Bounce" in order to meet with several friends—Brandi Mills, Joe Baron, and Amy Lewis. (Doc. 33, Patrizi dep., at 19–20, 26–27). Meanwhile, Officers Connole and Huff entered the club to investigate a possible assault. (Doc. 35, PX B, Cleveland Police arrest report, at 3). The alleged victim told the officers that the alleged assailant was in the group including Ms. Mills, Mr. Baron, and Ms. Lewis. (Doc. 35, PX B, at 3–4; *see also* Doc. 33, Patrizi dep., at 37, 39).

The officers approached this group and asked its members to step into a quieter area, near one of the exits. As the group was moving toward the exit, Ms. Mills signaled Ms. Patrizi to join them. (Doc. 33, Patrizi dep., at 38, 40, 48; Doc. 35, PX A, Mills decl., at ¶ 3). Ms. Patrizi joined the group. (Doc. 33, Patrizi dep., at 43). Once Officer Connole had the group gathered near the exit, he began questioning Ms. Mills. Ms. Patrizi recalled that the officer was not abusive or intimidating, "just doing his job asking questions" of Ms. Mills. (Doc. 33, Patrizi dep., at 45). Ms. Patrizi testified:

> It was mostly, tell me what happened kind of questions. Then it, through his line of questioning, became more apparent to me that something had happened and that's when I first asked him, are you accusing—again I don't remember—specifically recall what I said—along the lines, are you accusing her of something? Is she a suspect? Things of that nature.

(Doc. 33, Patrizi dep., at 46–47; *see also* Doc. 35, PX A, Mills decl., at ¶ 6).

Ms. Patrizi testified that she questioned Officer Connole, although her recollection as to what she said is unclear:

Q. Do you recall identifying yourself as a lawyer while you were standing there?
A. Yes.

Q. At any point during the proceedings did Officer Connole ask you to desist or quit speaking while he was talking to Miss Mills and the others?
A. No.

Q. Do you recall telling Officer Connole she doesn't have to say anything to you?
A. No.

Q. If I understood you right, do you recall asking him, are you accusing her of something?
A. Like I said, not necessarily specifically what I said, but I was trying to understand what he was—why he was bringing these people here, you know. What was the nature of—you know, what was underlying his questioning.

(Doc. 33, Patrizi dep., at 48). Later in her deposition, Ms. Patrizi seemed to indicate that she may have told the police that Ms. Mills did not have to cooperate.

A. ... the questioning from the officer turned to more where it was evident to me that Brandi [Mills] was not just being questioned about a general incident, that it was a specific assault on Heather [Wallace], that's again when I asked the officer, you know, is she in custody? Are you, you know—if you're—if she's in custody, you know, she doesn't have to—you know, you have to read her her rights at that point or she doesn't have to continue to talk to you.

I mean, I guess I was trying at that point to see if it was a custodial interview or a social encounter from the perspective of the officer.

(Doc. 33, Patrizi dep., at 49–50).

At his deposition, Officer Connole agreed that part of what Ms. Patrizi was trying to figure out was whether Ms. Mills was in custody. (Doc. 32, Connole dep., at 50). Officer Connole also testified as follows:

Q. Did any of the three people answer your questions before Miss Patrizi was arrested?
A. They—I don't know how far I got before Miss Patrizi was walked out, but they had started to and every time she would talk, she would either prevent me from asking a question or she would stop them from talking to me.

Q. Did she directly address the individuals and tell them not to talk to you?
A. Yes.

Q. Did she directly address you and ask you any questions?
A. Yes.

Q. And best you can recall, what were the questions she asked you?
A. That she asked me do you consider my client a suspect? Why are you questioning them? What are they being charged with? Stuff along that line. That's probably the best I could do.

Q. What did she say to the three individuals?
A. That they don't have to talk to me, that I have no reason to talk to them.

(Doc. 32, Connole dep., at 17–18).

Officer Connole's responses are corroborated by Ms. Mills who said that "[Patrizi] reminded me that I had the right to remain silent and that I did not have to respond to the officer's continued questions. I considered her statements to me to be legal advice." (Doc. 35, PX A, Mills decl., at ¶ 6).

However, despite Ms. Patrizi's statements and questions, Officer Huff testified that he never noticed Ms. Patrizi raise her voice during the questioning. (Doc. 31, Huff dep., at 58). As well, Ms. Mills stated that Ms. Patrizi never raised her voice when she was involved in the exchange

with Officer Connole. (Doc. 35, PX A, Mills decl., at ¶ 8).

Furthermore, Ms. Patrizi asserts that she was never asked to back away or otherwise let Officer Connole proceed with his questions. She was simply arrested. (Doc. 35, at 4). This, however, is disputed by the defendants. Officer Huff testified that Officer Connole nodded to him, yelled his name, and told him to "get her out of here." (Doc. 31, Huff dep., at 60). Regarding the arrest of Ms. Patrizi, Officer Huff testified as follows:

Q. Up to that point had you observed her engage in acts yourself that you believed gave you probable cause to arrest her for obstructing official business?

A. I had not, no.

Q. What happened when your partner indicated to you you should get her out of here?

A. To the best of my recollection, because obviously it was a long time, I advised her she had to leave. I grabbed her by the arm and took her outside the club.

Q. At that point did you know why you were doing that?

A. I was trying to separate her from the group so he could do what he needed to do.

Q. You advised her she had to leave, what did she say?

A. I believe she said she didn't have to leave.

Q. Did she resist your direction?

A. Absolutely.

Q. How did she resist?

A. You know, subtle things. Stiffening up, not walking with us, having to be pulled.

Q. She had to be pulled?

A. Yes. I'm not saying literally pulled, you know, escorted out. There is different versions—

Q. Did you cuff her before she left the building?

A. You know, I couldn't remember—it was either outside—I couldn't remember if it was outside or in the lobby at the time.

(Doc. 31, Huff dep., at 60–62).

Further, according to the arrest report, Ms. Patrizi "attempted to start pointing at [Huff] when [he] grabbed her arm and said you need to go outside while we finish our invest[igation]." (Doc. 35, PX B, arrest rpt., at 4). Ms. Patrizi pulled away from Officer Huff, and said "I don't have to leave." *Id.* Officer Huff advised her she must leave now, and Ms. Patrizi swung her arm around at him and said "I don't have to go anywhere." *Id.* The report continues that Officer Huff then advised Ms. Patrizi that she was under arrest, placed her in handcuffs and physically escorted her out of the door "while she stiffened up and was stopping her walk." *Id.* Ms. Patrizi, however, disputes this series of events, and refers to the security video camera which videotaped (without audio) a portion of the incident. (Doc. 35, at 1; *see* Doc. 4, DVD). There is no evidence on the video of Ms. Patrizi pointing her finger in Officer Connole's face (or Officer Huff's). There is no evidence on the video of Ms. Patrizi pulling away from Officer Huff after he seized her. There is no evidence on the video of Ms. Patrizi swinging her arm at Officer Huff. There is no evidence on the video of Ms. Patrizi stiffening her walk, or otherwise resisting while Huff walks her out the door. (Doc. 4).

After Officer Huff arrested Ms. Patrizi, she was charged with "obstructing official business" under the City of Cleveland's Ordinance § 615.06. (Doc. 1, compl., at ¶¶ 10–11, 16). However, the City of Cleveland Prosecutors' Office subsequently dismissed those charges.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (*quoting Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994) (marking as standard that the plaintiff must present "more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted).

## III. LAW AND ANALYSIS

■ The complaint alleges that Ms. Patrizi's arrest for obstructing official business was made without probable cause in violation of the 4th and 14th Amendments. (Doc. 1, compl., at ¶¶ 1, 18, 21). This

federal claim arises under 42 U.S.C. § 1983, which requires a plaintiff to "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights,* 437 F.3d 527, 533 (6th Cir.2006).

The defendants contend that they had probable cause to arrest Ms. Patrizi and that, even if they did not, the doctrine of qualified immunity shields their actions from this § 1983 claim. *See Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (establishing that police officers may claim qualified immunity from suits brought under § 1983).

## A. Question of Probable Cause to Arrest Ms. Patrizi

■ The U.S. Constitution permits a police officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed an offense. *Estate of Dietrich v. Burrows,* 167 F.3d 1007, 1010 (6th Cir.1999) (citing *Michigan v. DeFillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). Conversely, an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment. *Ingram v. City of Columbus,* 185 F.3d 579, 592–593 (6th Cir.1999). "Probable cause" means that the facts and circumstances within the officer's knowledge are sufficient to warrant a reasonably prudent person to believe, in the circumstances shown, that the suspect has committed or is about to commit the offense. *Dietrich,* 167 F.3d at 1010–1011.

■ In the present case, Ms. Patrizi argues that the defendants arrested her for obstructing official business without

probable cause, in violation of the Fourth Amendment. (Doc. 1, compl., at ¶¶ 1, 18, 21). Although Ms. Patrizi was charged with "obstructing official business" under the City of Cleveland's Ordinance § 615.06, the parties agree that the ordinance is substantively identical to Ohio Rev.Code § 2921.31(A). *See, e.g.,* Doc. 35, at 10–11 (difference is gender-neutral phrasing). State law has therefore been used to interpret the ordinance. *Id.* (citing *City of Cleveland v. Kristoff,* No. 80086, 2002 WL 441584 (Ohio Ct.App. 2002)).

The elements of the offense of obstructing official business are: (1) No person, without privilege to do so; (2) with purpose to prevent, obstruct or delay the performance by a public official of any authorized act within his official capacity; (3) shall do an act which hampers or impedes a public official in the performance of his lawful duties. *Kaylor v. Rankin,* 356 F.Supp.2d 839, 845 (N.D.Ohio 2005) (citing Ohio Rev.Code § 2921.31(A)).

■ Courts have generally required an affirmative act for the offense of obstructing official business. *State v. Grice,* 180 Ohio App.3d 700, 703, 906 N.E.2d 1203 (Ohio Ct.App.2009). An affirmative act is defined as any conduct, physical or verbal, that hampers or impedes the officer in the performance of his or her duties. *State v. Wellman,* 173 Ohio App.3d 494, 499, 879 N.E.2d 215 (Ohio Ct.App.2007). There are no bright line rules for what hampers or impedes an officer; thus, the court must analyze the defendant's "entire course of conduct." *Id.*

If a defendant's actions are verbal in nature, then the above analysis implicates the First Amendment. Citizens must be given "considerable latitude ... to express their views about the police and their activities." *Kaylor,* 356 F.Supp.2d at 847. At the same time, if a defendant's speech

transforms into verbal conduct, then this *conduct* can constitutionally be criminalized. *See id.*

In *State v. Wellman,* the defendant's behavior "crossed the line between fair protest and actual obstruction" where the defendant prevented officers from talking to an individual, not simply through asking questions, but by being belligerent and argumentative. *Wellman,* 173 Ohio App.3d at 499, 879 N.E.2d 215. The defendant's conviction for obstructing official business was affirmed because the court found that the defendant's "entire course of conduct" impeded the officers from performing their official duties. *Id.* at 499, 879 N.E.2d 215. In *City of North Ridgeville v. Reichbaum,* the defendant's speech transformed into verbal conduct, where the defendant repeatedly interrupted and shouted at the officer attempting to question the defendant's stepdaughter, repeatedly answered the questions directed at the stepdaughter, and ignored the officer's instructions to desist. *City of North Ridgeville v. Reichbaum,* 112 Ohio App.3d 79, 80–81, 677 N.E.2d 1245 (Ohio Ct.App. 1996). The court found the defendant's behavior constituted multiple affirmative acts which supported his conviction for obstructing official business. *Id.* The shouting, yelling, repeated interruptions, and refusal to desist in this case, like the belligerence and argumentativeness in *Wellman,* were sufficient viewing the defendant's entire course of conduct to impede the officer in the performance of his lawful duties.

In the present case, construing the evidence, as well as any inferences to be drawn from it, in the light most favorable to the non-movant, *Kraus v. Sobel Corrugated Containers, Inc.,* 915 F.2d 227, 229 (6th Cir.1990), Ms. Patrizi's speech never transformed into verbal conduct and her behavior never constituted an affirmative act. Ms. Patrizi did not conduct herself in a belligerent or argumentative manner as in *Wellman.* Nor did she shout or refuse to desist in her course of conduct as in *Reichbaum.* Viewing Ms. Patrizi's entire course of conduct, she was merely advising her friends of their constitutional rights, while at the same time attempting to ascertain from the police if Ms. Mills was in custody. Ms. Patrizi only joined the group being questioned because Ms. Mills signaled her to join. Her friends never instructed Ms. Patrizi to leave; in fact, they considered Ms. Patrizi's statements to be legal advice. Each one of Ms. Patrizi's actions was measured and reasonable. Furthermore, the security video camera at "Bounce" does not show Ms. Patrizi physically interfering with the officers' investigation. (Doc. 4). There are no indications that she hampered or impeded the defendants' investigation.

Ms. Patrizi's behavior was similar to the defendant's behavior in *Kristoff,* a case in which no obstructive action was found. *City of Cleveland v. Kristoff,* No. 80086, 2002 WL 441584 (Ohio Ct.App.2002). There, the defendant encouraged his friend to refuse to answer the detectives' questions until they provided identification establishing that they were, in fact, detectives. *Id.* at *1. Like the defendant in *Kristoff,* Ms. Patrizi simply advised and encouraged her friends to remain silent. Like the defendant's comments in *Kristoff,* Ms. Patrizi's comments may have disturbed the officers, but there is no evidence that they "were spoken so boisterously and in such a manner as to prevent the [officers] from carrying out their duties." *Id.* at *2. Any contention that Ms. Patrizi prevented her friends from getting a word in edgewise can be countered by the favorable inference that her friends were simply heeding her lawyerly advice to remain silent.

Furthermore, the fact that Officer Connole strained to hear the suspects because of the noisy club and Ms. Patrizi's statements does not illustrate the existence of obstructive conduct. The defendants cannot attribute the noisy club atmosphere to Ms. Patrizi. Moreover, the officers could have spoken with Ms. Patrizi's friends outside, and even if Ms. Patrizi followed them, the situation would have been similar to *Kristoff.* Ms. Patrizi still would have been a citizen encouraging her friends to refuse to answer police questions.

The defendants would have the Court rely on *King v. Ambs,* a case which involved an arrest for obstruction under a Michigan township ordinance. (Doc. 36, at 10–12, citing *King v. Ambs,* 519 F.3d 607 (6th Cir.2008)). In that case, the defendant repeatedly urged his friend to ignore an officer's questions. *Id.* at 610. Even after the defendant's friend shut a door in his face to go speak with the officer, and after the officer commanded the defendant to stop interfering with the investigation, the defendant continued interrupting. *Id.* The court ruled that the arrest was not violative of the First amendment because the defendant's "act of speaking, by virtue of its time and manner, plainly obstructed ongoing police activity involving a third party." *Id.* at 614.

The defendants' attempt to analogize the present case to *King* fails. First, unlike the defendant's friend in *King,* Ms. Patrizi's friends never made an overt attempt to speak with the officers or signaled Ms. Patrizi to stop talking. Second, unlike the officer in *King,* the officers never told Ms. Patrizi that she was interrupting, nor did they instruct her to desist. Unlike the defendant's conduct in *King,* Ms. Patrizi's speech never transformed into verbal conduct, and she never obstructed official police business.

Thus, the facts and circumstances known to the officers could not lead a prudent officer to believe that Ms. Patrizi had committed a violation of the City of Cleveland ordinance. It was not objectively reasonable for the officers to believe they had probable cause, and the evidence before the Court does not support a finding of probable cause for an arrest for obstructing official business.

The Court finds that there is not "only one reasonable determination possible" on the existence of probable cause, thus it is properly a question for the jury. *Everson v. Leis,* 556 F.3d 484, 499 (6th Cir.2009).

### B. The Right is Clearly Established

■ The Court must next consider whether the officers are entitled to qualified immunity—whether the constitutional right at issue is clearly established. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his [or her] conduct was unlawful in the situation he [or she] confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151.

Using the doctrinal analysis above, Ms. Patrizi had a clearly established right in this case. The defendants claim that Ms. Patrizi's arrest was a reasonable mistake based upon "the indefinite contours of the affirmative act requirement." (Doc. 43 at 12–13). Although there are no bright lines for what constitutes obstructive conduct

under statute or case law, this does not mean it was unclear that Ms. Patrizi's behavior did not constitute obstructive conduct. She exhibited none of the hallmarks of obstructive conduct such as the belligerence and argumentativeness of *Wellman* or the shouting and refusal to desist of *Reichbaum.* Furthermore, viewing her conduct in its entirety, she identified herself as a lawyer, advised her friends of their constitutional rights, and asked the police if her friends were in custody. Her actions were eminently reasonable and never approached what could be considered obstructive conduct. Despite the arguably ambiguous affirmative act test, her arrest was unreasonable.

Although probable cause is an objective standard, the subjective beliefs of a police officer concerning the existence of probable cause are surely relevant to both the probable cause determination and the qualified immunity analysis. Officer Huff testified that he did not observe Ms. Patrizi engage in acts giving him probable cause to arrest her during the relevant time frame. (Doc. 31, Huff dep., at 60–62). As far as Officer Huff's own personal subjective determination is concerned, there is no ambiguity and this was not a close call. Furthermore, Officer Connole testified that he never intended to arrest Ms. Patrizi during the relevant time frame. (Doc. 32, Connole dep., at 53–54). Although an officer can choose not to arrest a suspect even if he or she is constitutionally permitted, Officer Connole's decision suggests he did not believe there was probable cause. Taken together, these facts show that the right is sufficiently clear so that a reasonable officer would, or should have, understood the constitutional right at issue.

It would have been clear to a reasonable officer that arresting Ms. Patrizi was unlawful. *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. The Court finds that Ms. Patrizi has carried her burden to show that the defendants are not entitled to qualified immunity. The defendants' Motion for Summary Judgment will be denied.

## IV. CONCLUSION

For the reasons set forth above, this Court denies the defendants' Motion for Summary Judgment and request for qualified immunity.

IT IS SO ORDERED.

## *REPORT AND RECOMMENDATION*

McHARGH, United States Magistrate Judge.

The plaintiff Judi Patrizi ("Patrizi") filed a three-count complaint in this court against defendants Cleveland Police Officers Scott W. Huff ("Huff") and Thomas W. Connole ("Connole"). The first count of the complaint alleges violations of Patrizi's rights under the Fourth and Fourteenth Amendments, an action under *42 U.S.C. § 1983.* The second claim alleged false arrest, and the third claim was for malicious prosecution. (*Doc. 1.*) Patrizi has since dismissed these state law claims. (*Doc. 12.*)

These claims arise from Patrizi's early-morning arrest at a night club during a police investigation of an alleged assault. (*Doc. 1*, compl., at ¶¶ 9, 13, 16.) Patrizi, an attorney, was not accused of the assault, but rather became involved during the questioning of her friend, and was subsequently arrested and charged with obstructing official business. *Id.* at ¶¶ 10–11, 16. The complaint alleges that the club's surveillance video does not support the police officers' version of events which led to Patrizi's arrest. *Id.* at ¶¶ 13–17.

Although the charges against Patrizi were later dismissed, she contends that "the arrest without probable cause caused her to spend time in jail, retain a criminal defense attorney, battle the charges and

live in fear that her prospects for a pending attorney position would be dashed because of the arrest." (*Doc. 35*, memorandum in opposition, at 1.)

The defendants move for summary judgment on the remaining Section 1983 claim, arguing that Patrizi's arrest was objectively reasonable in light of the circumstances, and that they are entitled to qualified immunity. (*Doc. 30*.) Patrizi has filed a memorandum in opposition (*doc. 35*), and the defendants have filed a reply (*doc. 36*).

## I. SUMMARY JUDGMENT

Summary judgment is appropriate where the record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56(a)[1]. Non-moving parties may rest neither upon the mere allegations of their pleadings nor upon general allegations that issues of fact may exist. See *Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1275 (6th Cir. 1974). The Supreme Court held that:

> ... Rule 56(c)[2] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Rule 56 requires the opposing party:

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts

showing that there is a genuine issue for trial."

*Id.* at 324, 106 S.Ct. 2548.

The Sixth Circuit in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), has interpreted *Celotex* and two related cases, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), as establishing a "new era" of favorable regard for summary judgment motions. Street points out that the movant has the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. *Street*, 886 F.2d at 1479.

In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion. *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir.1990).

## II. SECTION 1983 CLAIM

To prove a claim under *42 U.S.C. § 1983*, the plaintiff must identify a right secured by the Constitution or laws of the United States, and the deprivation of that right by a person acting under color of state law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994).

---

**1.** Civil Rule 56 was totally revised by amendment effective December 2010. The Committee Note makes it clear that the standard for granting summary judgment remains unchanged. See, e.g., *Diaz v. Mitchell's Salon and Day Spa, Inc.*, No. 1:09CV882, 2011 WL 379097, at *1 (S.D.Ohio Feb. 2, 2011). However, the specific language of the Rule has been modified.

**2.** Now Rule 56(a).

## A. Fourth Amendment Violation

The complaint alleges that Patrizi's arrest for obstructing official business was made without probable cause. (*Doc. 1, compl.,* at ¶¶ 1, 18, 21.)

The Constitution permits a police officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed an offense. *Estate of Dietrich v. Burrows,* 167 F.3d 1007, 1010 (6th Cir.1999) (citing *Michigan v. DeFillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). Conversely, an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment. *Ingram v. City of Columbus,* 185 F.3d 579, 592–593 (6th Cir. 1999); *Cook v. Sheldon,* 41 F.3d 73, 78 (2d Cir.1994); *Kaylor v. Rankin,* 356 F.Supp.2d 839, 845 (N.D.Ohio 2005). "Probable cause" means that the facts and circumstances within the officer's knowledge are sufficient to warrant a reasonably prudent person to believe, in the circumstances shown, that the suspect has committed or is about to commit the offense. *Dietrich,* 167 F.3d at 1010–1011; *Kaylor,* 356 F.Supp.2d at 846.

## III. QUALIFIED IMMUNITY

The defendants argue that the individual defendants are entitled to qualified immunity. (*Doc. 30,* at 6–18.) The issue of qualified immunity must be addressed at the earliest possible point in the litigation. *Pearson v. Callahan,* 555 U.S. 223, 230, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009); *Saucier v. Katz,* 533 U.S. 194, 200–201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Supreme Court has stated that the inquiry regarding qualified immunity is distinct from the merits of the constitutional claim itself. *Saucier,* 533 U.S. at 204, 121 S.Ct. 2151; *Dunigan v. Noble,* 390 F.3d 486, 491 n. 5 (6th Cir.2004).

A government official who is performing a discretionary function is entitled to qualified immunity from suit[3] as long as his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson,* 129 S.Ct. at 815 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Painter v. Robertson,* 185 F.3d 557, 567 (6th Cir.1999). In other words, any "objectively reasonable" action by a state officer, as assessed in the light of clearly established law at the time of the conduct at issue, will be protected by qualified immunity. *Painter,* 185 F.3d at 567. Qualified immunity can be defeated if the official "knew or reasonably should have known" that the action he took would violate the constitutional rights of the plaintiff. *Harlow,* 457 U.S. at 815, 102 S.Ct. 2727. Qualified immunity is a purely legal question which must be determined early in the proceedings. *Saucier,* 533 U.S. at 200, 121 S.Ct. 2151; *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

The defendants bear the initial burden of coming forward with facts which suggest that they were acting within the scope of their discretionary authority at the time in question. *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992). (The defendants here have met their initial burden: it is uncontested that the police officers and other governmental defendants were acting in their official capacities.)

The burden then shifts to Patrizi. The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity. *Untalan v. City of Lorain,* 430 F.3d 312, 314

---

3. Qualified immunity is an immunity from suit, rather than a mere defense to liability.

*Pearson,* 129 S.Ct. at 815; *Saucier,* 533 U.S. at 200; *Dunigan,* 390 F.3d at 490.

(6th Cir.2005); *Cartwright v. City of Marine City,* 336 F.3d 487, 490–491 (6th Cir. 2003) (citing *Rich,* 955 F.2d at 1095). Upon the assertion of qualified immunity, the plaintiffs must put forward "specific, nonconclusory factual allegations" that would defeat the immunity. *Siegert,* 500 U.S. at 236, 111 S.Ct. 1789 (Kennedy, J., concurring).

The Supreme Court recently held that the "two-step sequence" previously required by *Saucier v. Katz* "should no longer be regarded as mandatory," and that district courts have discretion in "deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson,* 129 S.Ct. at 818. The two factors which are relevant to demonstrate whether or not the defendants are entitled to qualified immunity from suit are "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson,* 129 S.Ct. at 815–816 (internal citations omitted); see also *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

Whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a general broad proposition." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. The relevant inquiry in determining whether a right is clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004); *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. If the law does not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. See

also *Pearson,* 129 S.Ct. at 816 (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

"In other words, where a constitutional violation exists, an officer's personal liability turns on the 'objective legal reasonableness' of the action in view of the circumstances the officer confronted assessed in light of 'clearly established' legal rules." *Dunigan,* 390 F.3d at 491 (citing *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151; *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034).

### A. Probable Cause

Patrizi argues that she was arrested by the defendants without probable cause, for obstructing official business, in violation of the Fourth Amendment. (*Doc. 35,* at 10.)

Whether there is probable cause for an arrest depends on whether there are sufficient "facts and circumstances within the officer's knowledge" to warrant a prudent officer to believe that the suspect had committed or was about to commit an offense. *Kaylor,* 356 F.Supp.2d at 846 (citing *DeFillippo,* 443 U.S. at 37, 99 S.Ct. 2627; *Beck v. Ohio,* 379 U.S. 89, 90, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). The officer's actions are measured by what a reasonable officer would have done under the same circumstances. If a reasonable officer under the same circumstances would have believed that the arrest was lawful, then the arresting officer is entitled to qualified immunity. *Cook,* 41 F.3d at 78; *Kaylor,* 356 F.Supp.2d at 846.

In other words, an arresting officer is entitled to qualified immunity if he "could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time" by the arresting officer. *Everson v. Leis,* 556 F.3d 484, 499 (6th Cir.2009). In general, however, "the existence of probable cause in a § 1983 action presents a jury ques-

tion, unless there is only one reasonable determination ·possible." *Everson,* 556 F.3d at 499 (quoting *Fridley v. Horrighs,* 291 F.3d 867, 872 (6th Cir.2002)); see also *Humphrey v. Mabry,* 482 F.3d 840, 851 (6th Cir.2007); *Pyles v. Raisor,* 60 F.3d 1211, 1215 (6th Cir.1995).

Although Patrizi was charged with obstructing official business under the City of Cleveland's Ordinance 615.06, the parties agree that the ordinance is substantively identical to *Ohio Rev.Code § 2921.31(A).* See, e.g., *doc. 35,* at 10–11 (difference is gender-neutral phrasing). Thus, state law has been used to interpret the ordinance. *Id.* (citing *City of Cleveland v. Kristoff,* No. 80086, 2002 WL 441584 (Ohio Ct.App.2002)).

The elements of the offense of obstructing official business are:

> (1) No person, without privilege to do so; (2) with purpose to prevent, obstruct or delay the performance by a public official of any authorized act within his official capacity; (3) shall do an act which hampers or impedes a public official in the performance of his lawful duties.

*Kaylor,* 356 F.Supp.2d at 846 (citing Ohio Rev.Code § 2921.31(A)).

Ohio courts have held that "the absence of privilege is not an essential element[4] of obstructing official business that the state must prove beyond a reasonable doubt." *State v. Gordon,* 9 Ohio App.3d 184, 186–187, 458 N.E.2d 1277, 1280 (Ohio Ct.App. 1983); accord, *Columbus v. Montgomery,* No. 09AP–537, 2011 WL 983080, at *14 (Ohio Ct.App.2011). Rather, privilege is generally an affirmative defense to a charge of obstructing official business. See, e.g., *State v. Robinson,* 103 Ohio App.3d 490, 496, 659 N.E.2d 1292, 1296 (Ohio Ct.App.1995).

Courts have generally required an affirmative act for the offense of obstructing official business. *Cleveland Heights v. Lewis,* 187 Ohio App.3d 786, 793, 933 N.E.2d 1146, 1151 (Ohio Ct.App.2010) (citing cases); *State v. Grice,* 180 Ohio App.3d 700, 703, 906 N.E.2d 1203, 1205 (Ohio Ct. App.2009); *State v. Wellman,* 173 Ohio App.3d 494, 498, 879 N.E.2d 215, 218 (Ohio Ct.App.2007). For example, a mere failure to obey an officer's request, or a refusal to provide information or identification to police does not render one guilty of that offense. *Kaylor,* 356 F.Supp.2d at 846 n. 4 (citing cases); *Lewis,* 187 Ohio App.3d at 793, 933 N.E.2d at 1151 (citing cases); *Grice,* 180 Ohio App.3d at 703, 906 N.E.2d at 1205. The act must actually hamper or impede the officer in the performance of his duties. *Grice,* 180 Ohio App.3d at 703, 906 N.E.2d at 1205.

The affirmative act which obstructs official business can be verbal conduct. There is an obvious interplay involved with the First Amendment, which "gives considerable latitude to citizens to express their views about the police and their activities." *Kaylor,* 356 F.Supp.2d at 847.

In *City of Houston v. Hill,* the U.S. Supreme Court found that a Houston ordinance which made it unlawful to interrupt a police officer in the performance of his duties was constitutionally overbroad under the First Amendment. *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). Hill had been arrested for "wilfully or intentionally interrupt[ing] a city policeman … by verbal challenge during an investigation." *Hill,* 482 U.S. at 454, 107 S.Ct. 2502. The evidence showed that the ordinance was re-

---

4. In any event, "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be need-ed to support a conviction." *Adams v. Williams,* 407 U.S. 143, 148–149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

garded as penalizing "the mere interruption of a policeman while in the line of duty." *Id.* at 457, 107 S.Ct. 2502. The Court found that the enforceable portion of the ordinance dealt not with criminal conduct,[5] but with speech. *Id.* at 460, 107 S.Ct. 2502.

The Court in *Hill* pointed out that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Hill,* 482 U.S. at 461, 107 S.Ct. 2502. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–463, 107 S.Ct. 2502. The Court noted that "we have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Id.* at 465, 107 S.Ct. 2502. The Court found that the Houston ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words," and found it to be substantially overbroad. *Id.* at 465–467, 107 S.Ct. 2502.

Ohio courts have found that *Ohio Rev. Code § 2921.31* does not violate the First Amendment. In *State v. Wellman,* for example, the court found that:

> A person has a right to verbally protest a police officer's actions or even to argue with or curse at an officer. But that person does not have the right to hamper or impede the officer in the performance of the officer's duties. In this case, Wellman was not convicted based on the content of his speech, but on his volume and demeanor and his other actions that hindered the officers in conducting their investigation. His behavior "crossed the line between fair protest and actual obstruction."

*Wellman,* 173 Ohio App.3d at 503, 879 N.E.2d at 222. Thus, "courts have affirmed convictions for obstruction of official business only when the manner and context of the boisterous statement prevented a public official from carrying out his or her lawful duty." *Kaylor,* 356 F.Supp.2d at 847. See also *Lyons v. City of Xenia,* 417 F.3d 565, 574 (6th Cir.2005) (hostile or abusive speech that obstructs officers from fulfilling duties).

The proper focus for "obstructing official business" is not on the words spoken, but on the person's "conduct, verbal or physical, and its effect on the public official's ability to perform the official's lawful duties." *Wellman,* 173 Ohio App.3d at 499, 879 N.E.2d at 218. In Wellman, for example, the defendant's conviction for obstructing official business was affirmed where the court found that the defendant's "entire course of conduct" prevented the officers from gaining control of the situation in a crowded club which appeared to be in violation of liquor control regulations. "He actively prevented them from talking to the individual they believed was the manager of the club, not just by asking questions, but by being belligerent and argumentative." *Id.*

In *City of North Ridgeville v. Reichbaum,* police officers were dispatched to the defendant's residence to investigate a complaint of a disturbance. *City of North Ridgeville v. Reichbaum,* 112 Ohio App.3d 79, 677 N.E.2d 1245 (Ohio Ct.App.1996). When one of the officers attempted to question the defendant's stepdaughter Nicole, "who was extremely upset," the defendant repeatedly interrupted both the officer and Nicole, and repeatedly answered the questions that the officer asked to Nicole. *Reichbaum,* 112 Ohio App.3d at 80–81, 677 N.E.2d at 1246. Another officer repeatedly asked the defendant to calm

---

**5.** The portion of the Houston ordinance which prohibited assault on a police officer was preempted by the Texas Penal Code. *Hill,* 482 U.S. at 460–461, 107 S.Ct. 2502.

down, and tried to separate him from Nicole, but the defendant continued to answer the officer's questions to Nicole, and repeatedly yelled at that officer. *Id.* at 81, 677 N.E.2d at 1246. The court found multiple affirmative acts by the defendant which supported his conviction for obstructing official business:

... the defendant repeatedly answered the investigatory questions posed to Nicole and shouted so that Officer Neiman could not obtain Nicole's version of what had precipitated the disturbance call. Despite several warnings by Sergeant Garrow, the defendant continued in this course of conduct. The defendant resisted suggestions that he go into his house to be questioned and refused to be led to an area where he would be away from Nicole and Officer Neiman, despite being informed by Sergeant Garrow that an investigation of the complaint had to be conducted. Sergeant Garrow testified that he arrested the defendant only when he could not subdue him and when the complaint could not be investigated. Sergeant Garrow also stated that the "whole picture" and not any single act prompted the defendant's arrest. Officer Neiman was forced to cease his investigation when the defendant resisted efforts by Sergeant Garrow to subdue him.

*Id.* at 84, 677 N.E.2d at 1248.

In *City of Cleveland v. Kristoff,* by contrast, the defendant intervened when plain clothes detectives were questioning his friend. *Kristoff,* 2002 WL 441584, at *1. The defendant encouraged his friend to refuse to answer the detectives' questions until they provided identification establishing that they were in fact police detectives. They attempted to arrest the defendant for obstructing official business, and he resisted arrest. The trial court granted

defendant's motion to dismiss charges of obstructing official business, and resisting arrest. The court of appeals affirmed the judgment of the lower court. The court found that "courts have affirmed convictions for obstruction of official business only when the manner and context of the boisterous statement prevented a public official from carrying out his or her lawful duty." *Id.* The court ruled that, while the defendant's comments may have disturbed the detectives, there was no evidence that his comments "were spoken so boisterously and in such a manner as to prevent the detectives from carrying out their duties." *Id.* at *2. The appellate court held that "the trial court did not err in dismissing the case and finding that the charge of obstructing official business unconstitutionally infringed upon Kristoff's First Amendment rights." *Id.*

### 1. Spoken words as "physical interference"?

In their reply brief, the defendants would have the court rely on *King v. Ambs,* a case which involved an arrest for obstruction under a Michigan township ordinance. (*Doc. 36,* at 10–12, citing *King v. Ambs,* 519 F.3d 607 (6th Cir.2008).)

King was arrested for interfering with an officer's investigation—the allegation was that King repeatedly advised another person that he did not have to speak with the officer. The state court dismissed all counts. *King v. Ambs,* No. 04–74867, 2006 WL 800751, at *3 (E.D.Mich. Mar. 28, 2006). As to the charge of obstructing, the state court found that the officer had no probable cause to arrest King because he did not engage in any physical interference of the officer. *Id.*

King subsequently filed suit under Section 1983, alleging violations of the Fourth and First Amendments[6] to the Constitu-

---

6. Although First Amendment concerns are relevant in this context, Patrizi argues a

Fourth Amendment violation, based on lack

tion. The Fourth Amendment allegation was that the officer did not have probable cause to arrest King for obstruction under the township ordinance. *King*, 2006 WL 800751, at *5.

The state court had relied on *Michigan v. Vasquez* in dismissing the obstruction charge, because the ordinance "strongly resembled" the statute at issue in *Vasquez*. *King*, 2006 WL 800751, at *6. In Vasquez, the Supreme Court of Michigan had clarified the state's "resisting and obstructing" statute. *Michigan v. Vasquez*, 465 Mich. 83, 631 N.W.2d 711, 715 (Mich.2001), (citing Mich. Comp. Laws § 750.479). The court rejected an argument that the statute should encompass both physical and nonphysical conduct. *Id.* at 716. The court ruled that the proper interpretation of the word "obstruct" is "one that communicates an actual, or a threat of, physical interference." *Id.*

The court summarized its interpretation as follows:

> Under the plain meaning of *M.C.L. § 750.479*, conduct that rises to the level of threatened or actual *physical* interference is proscribed. Michigan's "resisting and obstructing" statute does not proscribe any manner of interference with a police officer, and it also does not proscribe only conduct that poses a threat to the safety of police officers; rather, it proscribes threatened, either expressly or impliedly, physical interference and actual physical interference with a police officer. Defendant's conduct did not constitute threatened or actual physical interference.

*Vasquez*, 631 N.W.2d at 721.

In granting summary judgment to the officer on the basis of qualified immunity, the district court rejected the state court's finding that the officer did not have probable cause to arrest King for obstruction.

*King*, 2006 WL 800751, at *5–*8. The district court found that King "engaged in active interference," and that his conduct in "persisting to interfere with Officer Ambs' investigation amounted to a physical interruption of the questioning." *Id.*

The Sixth Circuit upheld the district court's ruling. *King v. Ambs*, 519 F.3d 607 (6th Cir.2008). The court stated that King had been arrested after he advised the resident, for the third time, after a warning to cease, that the resident did not have to speak with the officer. *King*, 519 F.3d at 608–609. "The district court had properly granted qualified immunity because King's verbal interference with the investigation amounted to a 'physical interruption of the questioning,' which provided probable cause for the arrest." *King*, 519 F.3d at 610.

The Sixth Circuit thus found, implicitly, that the state court misapplied state law by relying on Vasquez to interpret the township's ordinance. *King*, 519 F.3d at 610–611. The court found that "the 'physical obstruction' limitation imposed on the term 'obstruct' in Vasquez may not apply to obstruction" in the township ordinance, because of differences in the wording. *Id.* at 611.

The court also found that the conduct for which King was arrested was "very different than the conduct at issue in Vasquez." *King*, 519 F.3d at 611. Rather than lying by using a false name, King "was arrested after repeatedly interrupting an officer who was questioning a third party." *Id.* The Vasquez court's lengthy analysis of the Michigan statute had not addressed spoken interruptions, as opposed to spoken lies; the Michigan Supreme Court had held that the statute "does not proscribe *any* manner of interference with a police officer," but rather

of probable cause to arrest. See, e.g., *doc. 35,*      at 10, 18–20.

physical interference. See generally *Vasquez*, 631 N.W.2d at 715–718, 721.

The Sixth Circuit found that, even if Vasquez's construction of "obstruction" governed, King's three spoken interruptions "could be characterized as 'physical interference' in the sense that King's speech interrupted Officer Ambs in a way that made it difficult, if not impossible, to conduct actual questioning." *King*, 519 F.3d at 612. Thus, the court agreed that the officer had probable cause. *Id.*

Notwithstanding King, the defendants in this case could not find support for probable cause to arrest under Michigan law; the issue before this court is whether there were sufficient facts and circumstances within the officers' knowledge to warrant a prudent officer to believe that Patrizi had committed or was about to commit an offense under the Cleveland ordinance. See generally *Kaylor*, 356 F.Supp.2d at 846. The court looks to Ohio state law in interpreting Cleveland Ordinance 615.06 because it is substantively identical to *Ohio Rev.Code § 2921.31(A)*, and state law has been used to interpret the ordinance. See, e.g., *Kristoff*, 2002 WL 441584. Under Ohio law, there is a violation of obstruction of official business "only when the manner and context of the boisterous statement prevented a public official from carrying out his or her lawful duty." *Kaylor*, 356 F.Supp.2d at 847. See also *Lyons*, 417 F.3d at 574 (hostile or abusive speech); *Wellman*, 173 Ohio App.3d at 499, 879 N.E.2d at 218 (entire course of conduct was belligerent and argumentative); *Kristoff*, 2002 WL 441584, at *1.

*B. Probable Cause for Patrizi's Arrest*

With the elements and the contours of the offense in mind, the court will examine the facts as provided by the parties. The court will construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to Patrizi as the party opposing the motion. *Humphrey*, 482 F.3d at 851; *Kraus*, 915 F.2d at 229.

On the evening of December 9, 2007, Plaintiff Judi Patrizi, an attorney, met her friend, Molly Baron ("Baron"), just after midnight so that the two of them could go to a nightclub called "Bounce" to socialize. (*Doc. 33*, Patrizi dep., at 19–20.) Patrizi had not been drinking prior to going to Bounce.

Patrizi and Baron arrived at Bounce around 12:30 a.m., and met with several other friends—Brandi Mills ("Mills"), Joe Baron ("Joe Baron"), and Amy Lewis ("Lewis")—who were already at the club. (*Doc. 33*, Patrizi dep., at 26–27.)

Meanwhile, Defendant Officers Connole and Huff received a radio call to investigate a possible assault at Bounce. (Doc. 35, *PX B*, Cleveland Police arrest report, at 3.) Upon arrival, they were met by the alleged victim, Heather Wallace ("Wallace"), who informed them that the alleged assailant was still in the club, and indicated the group including Mills, Joe Baron, and Lewis. (Doc. 35, *PX B*, at 3–4; see also doc. *33*, Patrizi dep., at 37, 39.)

The officers entered the club, and asked the members of the group to step into a quieter area, near one of the exits. As the group was moving toward the exit, Mills signalled to Patrizi, who was talking with another person at the bar, to join them. (*Doc. 33*, Patrizi dep., at 38, 40, 48; doc. 35, *PX A*, Mills decl., at ¶ 3.) Patrizi joined the group. (*Doc. 33*, Patrizi dep., at 43.)

Once Officer Connole had the group gathered near the exit, he began his questioning by speaking to Mills. Patrizi testified that the officer was not abusive or intimidating, "just doing his job asking questions" of Mills. (*Doc. 33*, Patrizi dep., at 45.) Patrizi recalled:

It was mostly, tell me what happened kind of questions. Then it, through his

line of questioning, became more apparent to me that something had happened and that's when I first asked him, are you accusing—again I don't remember—specifically recall what I said—along the lines, are you accusing her of something? Is she a suspect? Things of that nature.

And I remember the officer was just saying he was just doing an investigation, just getting information. Then the questioning continued, but then it became more obvious to me by what the officer was saying and asking that he was accusing Brandi [Mills] of assaulting Heather [Wallace]. Not necessarily he was accusing her, I guess that's not the right way of saying it. Obviously he's not making an accusation.

(*Doc. 33*, Patrizi dep., at 46–47; see also doc. 35, *PX A*, Mills decl., at ¶ 6.)

At that point, Patrizi testified that she questioned the officer, although her recollection as to specifically what she said appears to be unclear:

Q. Do you recall identifying yourself as a lawyer while you were standing there?

A. Yes.

Q. At any point during the proceedings did Officer Connole ask you to desist or quit speaking while he was talking to Miss Mills and the others?

A. No.

Q. Do you recall telling Officer Connole she doesn't have to say anything to you?

A. No.

Q. If I understood you right, do you recall asking him, are you accusing her of something?

A. Like I said, not necessarily specifically what I said, but I was trying to understand what he was—why he was bringing these people here, you know. What was the nature of—you know, what was underlying his questioning.

(*Doc. 33*, Patrizi dep., at 48.) Later in her deposition, Patrizi seemed to indicate that she may have told the police that Mills did not have to cooperate.

A. . . . the questioning from the officer turned to more where it was evident to me that Brandi [Mills] was not just being questioned about a general incident, that it was a specific assault on Heather [Wallace], that's again when I asked the officer, you know, is she in custody? Are you, you know—if you're—if she's in custody, you know, she doesn't have to—you know, you have to read her her rights at that point or she doesn't have to continue to talk to you.

I mean, I guess I was trying at that point to see if it was a custodial interview or a social encounter from the perspective of the officer.

(*Doc. 33*, Patrizi dep., at 49–50.)

At his deposition, Officer Connole agreed that part of what Patrizi was trying to figure out was whether Mills was in custody. (*Doc. 32*, Connole dep., at 50.) Connole also testified as follows:

Q. Did any of the three people answer your questions before Miss Patrizi was arrested?

A. They—I don't know how far I got before Miss Patrizi was walked out, but they had started to and every time she would talk, she would either prevent me from asking a question or she would stop them from talking to me.

Q. Did she directly address the individuals and tell them not to talk to you?

A. Yes.

Q. Did she directly address you and ask you any questions?

A. Yes.

Q. And best you can recall, what were the questions she asked you?

A. That she asked me do you consider my client a suspect? Why are you ques-

tioning them? What are they being charged with? Stuff along that line. That's probably the best I could do.

Q. What did she say to the three individuals?

A. That they don't have to talk to me, that I have no reason to talk to them.

(*Doc. 32,* Connole dep., at 17–18.)

Mills averred that "[Patrizi] reminded me that I had the right to remain silent and that I did not have to respond to the officer's continued questions. I considered her statements to me to be legal advice." (Doc. 35, *PX A,* Mills decl., at ¶ 6.)

Officer Huff testified that he never noticed Patrizi, Officer Connole, or anyone else raise their voice during the questioning. (*Doc. 31,* Huff dep., at 58.) Mills states that Patrizi never raised her voice when she was involved in an exchange with Officer Connole. (Doc. 35, *PX A,* Mills decl., at ¶ 8.)

Patrizi asserts that she was never asked to back away or otherwise let Officer Connole proceed with his questions. She was simply arrested. (*Doc. 35,* at 4.)

At some point, Officer Connole nodded to Officer Huff concerning Patrizi. Connole testified that he was "just kind of showing my displeasure with her interfering with the interview." (*Doc. 32,* Connole dep., at 53–54.) He did not intend for Huff to arrest her, the signal was meant as an "instruction to him to deal with her." *Id.* at 54.

Officer Huff testified that Connole nodded to him, yelled his name, and told him to "get her out of here." (*Doc. 31,* Huff dep., at 60.) Regarding the arrest of Patrizi, Huff testified as follows:

Q. Up to that point had you observed her engage in acts yourself that you believed gave you probable cause to arrest her for obstructing official business?

A. I had not, no.

Q. What happened when your partner indicated to you you should get her out of here?

A. To the best of my recollection, because obviously it was a long time, I advised her she had to leave. I grabbed her by the arm and took her outside the club.

Q. At that point did you know why you were doing that?

A. I was trying to separate her from the group so he could do what he needed to do.

Q. You advised her she had to leave, what did she say?

A. I believe she said she didn't have to leave.

Q. Did she resist your direction?

A. Absolutely.

Q. How did she resist?

A. You know, subtle things. Stiffening up, not walking with us, having to be pulled.

Q. She had to be pulled?

A. Yes. I'm not saying literally pulled, you know, escorted out. There is different versions—

Q. Did you cuff her before she left the building?

A. You know, I couldn't remember—it was either outside—I couldn't remember if it was outside or in the lobby at the time.

Q. Was she cuffed—

A. Yes.

Q.—behind?

A. We cuff everybody behind.

Q. When you got her outside, what happened then?

A. Another argument ensued, you know. She just didn't feel like I had a right to take her to jail. She felt she needed to be back inside there with her client, or supposed client.

Q. What did she say to you?

A. She asked me why I was taking her. I can't remember exactly the conversation, but I felt there was resistance there, you know. And in my professional opinion I felt that if I said, you're right, you can take off, you can leave, she would have been right back inside the club in the middle of what she was doing with my partner.

Q. At the point you directed her to leave with you out the door onto Detroit, did you know she was an attorney?

A. I did not know she was an attorney, no. I think she told me when she was in the back seat.

(*Doc. 31*, Huff dep., at 60–62.)

The arrest report filled out by Officer Huff that night stated that, while Officer Connole was interviewing Mills and Lewis, Patrizi "approached and began giving commands to the suspect (Mills) and witness (Lewis). PO Connole professionally and courteously asked the A/F [7] (Patrizi) to allow him to interview the parties involved. The A/F then pointed right into PO Connole's face and stated 'she doesn't have to say anything to you.'" (Doc. 35, *PX B*, arrest rpt., at 4.) The report goes on to state that Connole attempted to advise Patrizi, but he could not get a word in edgewise because Patrizi was talking over him, while continuing to point her finger in his face ("a few inches away"). The report states that Patrizi was saying things like, "She doesn't have to answer to you" and "You have no right to question her," "What are you charging her with." *Id.*

According to the arrest report, Officer Huff stepped in and advised Patrizi that they weren't charging anyone with anything, and were just investigating. (Doc. 35, *PX B*, arrest rpt., at 4.) The report states that Patrizi "attempted to start pointing at [Huff] when [he] grabbed her arm and said you need to go outside while we finish our invest[igation]." *Id.* Patrizi pulled away from Huff, and said "I don't have to leave." *Id.* Huff advised her she must leave now, and Patrizi swung her arm around at him and said "I don't have to go anywhere." *Id.* The report continues that Huff then advised Patrizi that she was under arrest, placed her in handcuffs and physically escorted her out of the door "while she stiffened up and was stopping her walk." *Id.*

In support of the motion for summary judgment, the defendants assert that Patrizi "was telling the three individuals that they did not have to talk with Officer Connole and that he had no reason to talk with them." (*Doc. 30*, at 4.) They contend that "Officer Connole was straining to hear the individuals he was talking with because the club was noisy and [Patrizi]'s interference made it harder to do what he was attempting to accomplish." *Id.* "By impeding the ongoing investigation of the alleged assault Plaintiff Patrizi created a reasonable belief in Officers Connole and Huff that there was probable cause [8] for arresting and charging her with obstruction of official business." *Id.* at 2.

---

7. A/F = "arrested female."

8. During his deposition, the arresting officer, Huff, offered differing theories for probable cause to arrest Patrizi. At one point, he states that they had probable cause for the arrest based on her behavior inside the club. See doc. 31, Huff dep., at 65, 68. Huff then testified that he actually arrested Patrizi for her behavior outside the club, which interfered with his ability to assist his partner inside. *Id.* at 67–68, 81–82, 91. This contradicts the arrest report he prepared that night: "I proceeded to advise the A/F she was under arrest, place her in handcuffs and physically escort her out of the door ..." (Doc. 35, *PX B*, at 4.) However, the defendants do not rely on this theory in their motion. See, e.g., *doc. 30*, at 3–5, 8.

Viewing the testimonial evidence most favorably to Patrizi, as the court must, Patrizi was merely advising a person, who she suspected might be undergoing a custodial interrogation, of her constitutional rights. Patrizi would have the right to do so whether she was an attorney or not. See, e.g., *Kristoff*, 2002 WL 441584. There is no indication that Patrizi conducted herself in an abusive, belligerent or argumentative manner, which might cross a line from persistent yet protected speech into actual obstruction, nor is there any evidence that she persisted after being warned that her conduct was interfering.

In addition, Patrizi points out that Bounce had a security video camera which videotaped (without audio) a portion[9] of the incident near the doors, where Officer Connole was questioning Mills and the others. (*Doc. 35*, at 1; see doc. 4, DVD.) The court has viewed the video, and agrees that the video does not reflect many of the physical events which are set forth in the arrest report. See generally *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (videotape clearly contradicts version of story told by respondent); *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n. 1 (9th Cir.2007) (although parties draw different inferences from video, court draws all reasonable inferences in favor of non-movant). There is no evidence on the video of Patrizi pointing her finger in Officer Connole's face (or Officer Huff's). See, e.g., *doc. 32*, Connole dep., at 37–39 (conceding that arrest report may be inaccurate as to finger-pointing). There is no evidence on the video of Patrizi pulling away from Huff after he seized her. There is no evidence on the video of Patrizi swinging her arm at Huff. There is no evidence on the video of Patrizi stiffening her walk, or otherwise resisting while

Huff walks her out the door. See generally doc. 4.

Viewing all the evidence, both testimonial and video, most favorably to Patrizi as the non-movant, the court finds that a reasonable officer would not have reason to believe that Patrizi's comments were spoken so boisterously and in such a manner as to prevent the officers from carrying out their duty to investigate the alleged assault. See, e.g., *Lyons*, 417 F.3d at 574 (hostile or abusive speech); *Kaylor*, 356 F.Supp.2d at 847 (manner and context of boisterous statement); *Wellman*, 173 Ohio App.3d at 499, 879 N.E.2d at 218 (entire course of conduct was belligerent and argumentative); *Kristoff*, 2002 WL 441584, at *1.

Thus, the facts and circumstances known to the officers could not lead a prudent officer to believe that Patrizi had committed a violation of the Cleveland ordinance. It was not objectively reasonable for the officers to believe they had probable cause, and the evidence before the court does not support a finding of probable cause for an arrest for obstructing official business. At a minimum, the court finds that there is not "only one reasonable determination possible" on the existence of probable cause, thus it is properly a question for the jury. *Everson*, 556 F.3d at 499; *Humphrey*, 482 F.3d at 851; *Pyles*, 60 F.3d at 1215.

As discussed earlier, a person has a clearly established Fourth Amendment right not to be arrested without probable cause. *Ingram*, 185 F.3d at 592–593; *Cook*, 41 F.3d at 78; *Kaylor*, 356 F.Supp.2d at 845. In the procedural context before the court, namely, the determination of whether the defendants are entitled to qualified immunity on summary

---

9. The defendants contend that the video does not show the entire incident at the exit. See, e.g., doc. 32, Connole dep., at 27–28, 33–34; doc. 36, at 4.

judgment, the facts that Patrizi has established make out a violation of that constitutional right.

The court finds that Patrizi has carried her burden to show that the defendants are not entitled to qualified immunity. The motion for summary judgment (doc. 30) should be denied.

## RECOMMENDATION

It is recommended that the motion for summary judgment (doc. 30) be denied, as discussed above.

Dated: Mar. 31, 2011.